367 P.2d 230

'Betty Jean SMITH, Appellant,

v.

John Paul SMITH, Appellee.

No. 6876.

Supreme Court of Arizona,
En Banc.

Dec. 28, 1961.

Langerman & Begam, by Robert Begam, Lewis, Roca, Scoville, Beauchamp & Linton, by John P. Frank, Phoenix, for appellant.

Cavanagh & O'Connor, by James H. O'Connor and Robert G. Beshears, Phoenix, for appellee.

STRUCKMEYER, Chief Justice.

This is an appeal from an order of the superior court changing the custody of a minor child based on these significant facts. On September 13th, 1957, appellant, Betty Jean Smith, was granted a divorce from appellee, John Paul Smith and given the care, custody and control of their child, Mark, with reasonable visitorial rights in appellee. The same year the minor child being then six years old was enrolled in the first grade in the public schools in Phoenix. On August 4th, 1958, appellee petitioned the superior court for a change of custody alleging inter alia that the child was not receiving proper care, teaching and education. Following a hearing, an order was entered changing the custody from appellant to appellee during the school year. Review of that order is here sought.

 Continuing jurisdiction to amend, change or alter the provisions of a decree relating to the custody of minor children is expressly recognized by statute, A.R.S. § 25–321. It is, however, the rule that as a condition to modification of custodial provisions there must be shown a change of circumstances materially affecting the welfare of the child. Galbraith v. Galbraith, 88 Ariz. 358, 356 P.2d 1023; Ward v. Ward, 88 Ariz. 130, 353 P.2d 895; Schulze v. Schulze, 79 Ariz. 86, 284 P.2d 457; Davis v. Davis, 78 Ariz. 174, 277 P. 2d 261. In matters pertaining to custody the best interest of the child is the primary consideration of the court; so where a change of custody is sought, it must be shown that the welfare of the child will be advanced by the change. Cone v. Righetti, 73 Ariz. 271, 240 P.2d 541. The trial court is in the best position to judge what will be in the best interest of the child but if the record shows an abuse of sound judicial discretion this Court will not hesitate to reverse or modify. Galbraith v. Galbraith, supra; Ward v. Ward, supra; Bradstreet v. Bradstreet, 34 Ariz. 340, 271 P. 717; McFadden v. McFadden, 22 Ariz. 246, 196 P. 452.

Appellant is a member of a religious group known as Jehovah's Witnesses. Apparently she became affiliated with this religious group some time prior to her divorce since the counterclaim in the divorce action alleged such affiliation. Pursuant to their beliefs appellant instructed the minor child not to salute the flag of the United States of America and not to participate in school activities where allegiance is pledged, and kept the child home on.

the day of the Christmas play. Appellant's testimony is illustrative of her attitude:

"Q. All right, do you object to the child saluting the flag? A. Yes.

"Q. Do you object to the child pledging allegiance to the flag? A. Yes.

"Q. Do you object to the child observing or participating in Christmas plays in school? A. Yes.

"Q. Even though all of the rest of the children or most of them, participate? A. Yes."

The Jehovah's Witnesses teach that the obligation imposed by Law of God is superior to laws enacted by governments. As one of their religious beliefs they consider that the flag is an image within the literal version of the Bible, Exodus, Chapter 20, Verse 4—"Thou shalt not make unto thee any graven image," and that the pledge of allegiance to the flag is a form of worship violating God's commandment against idolatry.

The lower court stated during the course of the trial:

" * * * unless the court is satisfied that Mrs. Smith is willing to forego those beliefs as far as her child is concerned, I certainly feel that there is some justification for a change of custody in this case."

and in pronouncing judgment:

"It is the judgment of the court Mrs. Smith that your attitude in that respect tends to bring ridicule upon your son. It tends to implant into his mind intolerance for his father's beliefs; and as long as that attitude prevails, I feel in all fairness you are not a fit and proper person to have his care and custody."

and thereafter:

"You don't love him enough Mrs. Smith—although the court has repeatedly put this question to you—to forego your religious beliefs to the extent of letting him acquire some of the religious beliefs and the normal activities that children enjoy and participate in in the public schools."

Following the decision by the United States Supreme Court in Minersville School District v. Gobitis, 310 U.S. 586, 60 S.Ct. 1010, 84 L.Ed. 1375, 127 A.L.R. 1493; cf. State of Arizona v. Davis, 58 Ariz. 444, 120 P.2d 808, the State Board of Education of West Virginia adopted a resolution ordering that a salute to the flag become a regular part of the program of activities in the public schools. Failure to conform was considered disobedience and was dealt with by expulsion. A child so expelled could be proceeded against as a delinquent and his parents liable to prosecution, a fine and jail term. On the com-

plaint of one Walter Barnette and others asserting an unconstitutional denial of religious freedom, of freedom of speech, of the due process and equal protection clauses of the Fourteenth Amendment, the Supreme Court of the United States determined that the action of the State Board of Education in compelling the flag salute transcended constitutional limitations. West Virginia State Board of Education v. Barnette, 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628. The Court observed that it was dealing with a compulsion to declare a belief, and an affirmation of an attitude of mind, that to sustain the flag salute as compulsory, it was necessary to say that the Bill of Rights which guarded the right to speak one's mind left it open to public authorities to compel the individual to utter what was not in his mind.

■ Since the decision in West Virginia State Board of Education v. Barnette, supra, it has been the uniform judgment of every court reaching the question that if a teaching does not conflict with the fundamental law of the land a parent may not be deprived of the custody of a child because of the court's disagreement with such parent as to religious beliefs. Jackson v. Jackson, 181 Kan. 1, 309 P.2d 705; Cory v. Cory, 70 Cal.App.2d 563, 161 P.2d 385; Stone v. Stone, 16 Wash.2d 315, 133 P.2d 526; Salvaggio v. Barnett, 248 S.W. 2d 244 (Tex.Civ.App.1952), cert. denied 344 U.S. 879, 73 S.Ct. 176, 97 L.Ed. 681; Bond v. Bond, 144 W.Va. 478, 109 S.E.2d 16. A parent who teaches a child doctrines at variance with majority views does not give rise to grounds sufficient to support a change of custody.

■ Appellee argues that there is no religious issue in this case because the hearing in the lower court was to determine the fitness of appellant as a parent. Patently, the determination of fitness was predicated on appellant's religious beliefs, for in the end the court put appellant to the compulsion of foregoing her beliefs or suffering the loss of her child. We can but reflect that if government through its courts can lawfully place the individual in the extreme of choosing between the active practice of a religious belief or suffering a burdensome loss, whether liberty, property or a child's association and companionship, what profit the people of this nation from thousands of years of bigotry and intolerance?

The First Amendment of the Constitution of the United States provides in part that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." By the Fourteenth Amendment the fundamental concepts embodied therein embrace the liberties guaranteed by the First Amendment. Cantwell v. State of Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.

Ed. 1213. Were the Constitution in need of justification, we would need only point to the language of the Supreme Court of the United States in Barnette.

> "Those who begin coercive elimination of dissent soon find themselves exterminating dissenters. Compulsory unification of opinion achieves only the unanimity of the graveyard. * * But freedom to differ is not limited to things that do not matter much. That would be a mere shadow of freedom. The test of its substance is the right to differ as to things that touch the heart of the existing order." 319 U.S. 624, 641–642, 63 S.Ct. 1178, 1187.

The foregoing should be dispositive of the appeal, however, there is a suggestion that the practices by appellant of her beliefs were injurious to the child. Appellee points to the language of the trial court:

> " * * * and I think I must recognize that any deviation from the normal school routine brings a certain amount of ridicule and criticism to the child which is, of course, the basis of implanting neuroses in the child."

We are not unaware that deviation from the normal often brings ridicule and criticism. We reject, however, the notion that it is necessarily the basis for implanting neuroses. Criticism is the crucible in which character is tested. Conformity stifles the intellect fathering decadency.

New ideas are the rungs upon which mankind supports itself in the long climb to perfection. It is sufficient to say until then, man's personality is not to be warped into a universal mold. A judgment supported only by the tenuous threads of a possible neuroses derived from deviation in normal activities will not withstand the thrust of constitutional guarantees.

The order of the court below is reversed.

BERNSTEIN, V. C. J., and UDALL, JENNINGS and LOCKWOOD, JJ., concurring.