421 P.2d 929

**Chyrl Merth (Ovens) ALLISON, Appellant,**

**v.**

**James M. OVENS, Jr., Appellee.**

**No. 1 CA–CIV 310.**

Court of Appeals of Arizona.
Dec. 29, 1966.
Rehearing Denied Jan. 26, 1967.
Review Granted March 29, 1967.

John J. Dickinson, Phoenix, for appellant.

Charles M. Brewer, Jerry H. Glenn, Herbert Mallamo, Phoenix, for appellee.

CAMERON, Judge.

This is an appeal from the judgment of the trial court modifying a previous decree of divorce respecting the custody of three minor children of Dr. James M. Ovens, Jr., and Chyrl Merth (Ovens) Allison. The three children were awarded to the father and the mother appeals regarding the change of custody as to two of the three children.

We are called upon to determine:

(1). Whether the trial court erred in considering evidence admitted in a prior hearing and adjudication of custody.

(2). Whether the trial court erred in refusing to suspend the rule excluding witnesses from testifying who have sat in the courtroom and watched the proceedings.

(3). Whether the trial judge erred by basing his judgment on facts which the appellant alleges he could not consider under the 1st and 14th Amendments to the Constitution of the United States and Article 20, Part First, of the Arizona Constitution, A.R.S.

(4). Whether the trial court erred and abused its discretion in the amount of attorney's fees awarded to the respondent-mother.

The facts necessary for a determination of this matter are substantially as follows: On 12 December 1958, the 17 year marriage of Chyrl and James Ovens was ended by divorce. Pursuant to the decree of divorce, the plaintiff and mother, Chyrl Ovens, was given custody of the 10 children with the exception of Michael Ovens, then 16 years old, who was granted permission to live with his father. The defendant and father was ordered to contribute $100.00 per month for the support of each child living with the mother.

On the day her divorce was final, the plaintiff was married in Mexico to one Andre Gerber. She later divorced Gerber and married R. J. Allison, her present husband. The defendant has also remarried.

In 1959, defendant petitioned for change of custody which was denied. The court in that hearing noted that:

"The rancor between the parties themselves has been the principal factor in the difficulties that have arisen."

Again, in 1963, defendant petitioned for a change of custody of the children, and this time he was awarded custody of three of the children who had previously elected to live with him.

In 1965, defendant again petitioned for a change of custody, and the determination of that matter in the Maricopa County Superior Court gives rise to this appeal. By emancipation, court action, and by the expressed desires of the children themselves, the custody of the children had been changed since the original decree such that at the time of the hearing; two were married and residing outside the home; four were residing with the defendant-father; two were residing with the plaintiff-mother; and two, the subject of this appeal, are residing with the plaintiff pending determination of the matter.

Trial was held in Maricopa County Superior Court in June and August of 1965, and the court, on 13 September 1965, awarded the care, custody and control of the three minor children to the father. The judgment contained the following provisions:

"It is further ordered, adjudged and decreed that pending any appeal that may be filed that the care, custody and control of the minor children Terrance, James Brian and Kevin be awarded to the defendant father in furtherance of any appeal that might be taken herein in order to guard the health, safety and welfare of the heretofore mentioned children until final determination may be made."

The mother immediately filed a notice of appeal and after several motions and writs, the trial court set a supersedeas bond in the amount of $50,000.00. The mother petitioned this Court for a writ of certiorari asking that we order the trial court to allow the mother to post a lesser bond and stay the order changing custody pending appeal. We denied the petition and the mother filed a writ of certiorari with the Arizona Supreme Court and they, in the case of Allison v. Chatwin, 99 Ariz. 99, 407 P.2d 69 (1965), reduced the bond to $4,000.00 and stated:

■ "It is not within the power of the lower court to award custody of children temporarily pending appeal." 99 Ariz. pages 102, 103, 407 P.2d page 71.

And:

"When an appeal is filed in a case in which custody of children is changed by the lower court, it is the duty of the court upon application to fix a supersedeas bond, the purpose of which is to preserve the status quo of the case pending appeal." Allison v. Chatwin, supra, 99 Ariz. page 102, 407 P.2d page 71.

This decision (Allison v. Chatwin, supra) of the Supreme Court of Arizona was in accord with previous decisions of that Court commencing with Gotthelf v. Fickett, 37 Ariz. 322, 294 P. 837 (1930), in which it has been held that posting of a supersedeas bond stays execution pending appeal of a judgment ordering change of custody of children. This Court has no quarrel with this rule of law as it applies to a change of custody in which the trial court has not found the home from which the children are being removed is detrimental to the health and welfare of the said children. In such a situation, no great damage is likely to be done to the children pending appeal. The situation is quite different, however, when, as in this case, the trial court has found that in order to "guard the health, safety, and welfare" of the children, the children should be removed from a detrimental environment. Under these circumstances,

this Court would question the wisdom in allowing the children to remain in this potentially damaging environment pending appeal by the posting of a supersedeas bond and we are also unable to say that a bond in any amount will suffice to repair the damage that may be done to children kept in the atmosphere described in this case for the period of time it takes to consider a matter on appeal, even though the matter may be accelerated on our calendar as was done here.

The $4,000.00 bond was posted and the two children in question have remained with the mother pending determination of this matter on appeal.

## CONSIDERATION BY THE TRIAL JUDGE OF EVIDENCE UPON WHICH A PRIOR ADJUDICATION OF CUSTODY HAD BEEN MADE

The appellant contends that the trial court could not consider testimony which had been introduced in a previous custody hearing. Appellant contends that in considering the question of whether there has been a change of circumstances the doctrine of res judicata must be applied. Appellant cites the following:

"The change of circumstances rule as a limitation on modification of a divorce decree is one aspect of the principle of res judicata (citations). The court, in issuing the original decree, found that the arrangement, therein set out was for the best interests of the child. No appeal having been taken, this decision became final, *upon the facts then before the court,* and no alteration will be made without a showing that the factual situation has changed to such an extent that the original decree can no longer reasonably be expected to serve the purpose." Ward v. Ward, 88 Ariz. 130, 134, 135, 353 P.2d 895, 898 (1960).

■ The rule set forth in Ward v. Ward, op cit, and other cases that the courts will not consider a change in custody without showing a sufficient change in circum-

stances is sound in that generally the best interests of the minor children are served by keeping them in the same environment and surroundings during their childhood, and the courts should not change the custody of the children with each slight change of circumstances.

But the fact the prior determination of custody by the court is res judicata as to the circumstances considered by the court at that previous time does not mean that evidence introduced at the prior hearing is necessarily inadmissible at subsequent hearings. Indeed, some matters will have to be shown the court in order that it may determine if there is in fact a change of conditions since the prior hearings.

In the instant case, the court admitted evidence establishing that both Gerber (plaintiff's second husband) and Mr. Allison (her present husband) possessed criminal records, in order to show what defendant's attorney called, "the propensity of the witness (plaintiff) for men of Mr. Gerber's class." The trial court in its findings stated:

"The plaintiff-respondent since her divorce from the defendant has developed a pattern characterized by associating with and did marry two men with criminal records and the presence of the present stepfather is not conducive to developing minors into good citizens and is detrimental to their individual welfare."

The trier of fact was being asked to and did draw an inference from the fact that she associated with people who had a criminal record and that she married two such men. We think it was within the broad discretion of the trial court to admit such evidence in determining what would be most beneficial for the children.

### REFUSAL OF THE TRIAL COURT TO RELAX THE "RULE" EXCLUDING WITNESSES

At the commencement of the proceeding, the attorney for plaintiff asked that the "rule" be invoked requiring that those who would be witnesses remain outside the courtroom until called and not disclose or discuss their testimony with anyone except counsel.

A private investigator, George Brooks, was called by the defendant and testified that on two occasions he saw one of the Ovens girls in the company of her stepfather Allison in what he described as dating situations. On rebuttal, and to the alleged surprise of plaintiff's counsel, a second investigator testified that he and Brooks on one occasion had gone to the Adams Hotel in an attempt to serve a subpoena. Under circumstances that are not quite clear, they discovered Mr. Allison and his stepdaughter in the alleyway near the Adams. The investigator testified to have seen the following in the light of his pocket flash:

"Mr. Allison's back was partly turned to me. The girl * * * was more or less cradled up close to him. She had her head down on his shoulder and in the crevice of his neck. He had his right arm over her shoulder and cupped over her right breast."

After each of these witnesses, counsel for the plaintiff requested leave to call the two Ovens girls to the stand. The following colloquy then took place:

"Court: * * * These girls are not the subject of a custody proceeding. The court does not feel and the record may show that there is evidence that there has been discussion among and between the witnesses with one side of this controversy and for that reason the court indicated to counsel that if their testimony is offered the court would likely sustain an objection to it because of the imposition of the rule. * * *

"I doubt that the court would be aided one way or another in talking to these girls in chambers.

"Counsel: * * * I think she * * * should be permitted to take the stand and deny things said in regard to her relationship with her stepfather.

"Court: I would have to insist that counsel could have reasonably anticipated that, and in the preparation of his case would make the proper preparation for this in connection with the rule of exclusion."

No offer of proof appears in the record concerning the Ovens' girl's testimony beyond the statement of counsel that she intended to controvert the testimony of the private detective. Mr. Allison was subpoened by the defendant, but failed to appear, and counsel for the plaintiff-mother claimed the marital privilege concerning his possible testimony.

Our Supreme Court has recently discussed the "rule" relating to the sequestration of witnesses in criminal cases as follows:

"Arizona has no statutory provision or criminal procedure rule relating to the sequestration of witnesses during a trial, but this common law practice was followed in our courts before Arizona became a state. Territory of Arizona v. Dooley, 3 Ariz. 60, 78 P. 138 (1889). The purpose of excluding witnesses from the trial is to encourage the discovery of truth, and detection and exposure of falsehood. State v. Thomas, 78 Ariz. 52, 275 P.2d 408 (1954). As we have previously said, exclusion of witnesses from the courtroom and administration of the exclusionary rule is within the sound discretion of the trial judge and this court will not disturb the ruling of the trial court unless there is shown an abuse of discretion and resulting prejudice therefrom. State v. Romero, 85 Ariz. 263, 336 P.2d 366 (1959)." State v. Sowards, 99 Ariz. 22, 26, 406 P.2d 202, 204 (1965).

We believe the same rule applies to civil cases and the trial court may, upon request of one of the parties or his own motion, invoke the "rule" excluding witnesses from the courtroom during trial.

Sequestration of witnesses lies within the sound discretion of the trial judge. Jones, Evidence, (5th Ed.), § 889, page 1664, Wigmore, Sequestration of Witnesses, 14 Harvard Law Review 475, Wigmore, Evidence (3rd Ed.), § 1839, page 357. See Annotation, 85 A.L.R.2d 478. In the instant case, the plaintiff had invoked the rule and had failed to anticipate that they might be called as witnesses which could reasonably be expected in a matter of this kind before the court. The two girls had heard enough testimony to be influenced thereby and the court did not err in excluding their testimony. Gwaltney v. Morris, 237 Md. 173, 205 A.2d 266 (1964).

## CONSIDERATION OF RELIGION

The plaintiff next contends that the trial court based its judgment on the religious activities of the parties and that this is contrary to the 1st and 14th Amendments to the Constitution of the United States and Article 20, Part First of the Arizona Constitution which reads as follows:

"First. Perfect toleration of religious sentiment shall be secured to every inhabitant of this State, and no inhabitant of this State shall ever be molested in person or property on account of his or her mode of religious worship, or lack of the same."

The trial court in its findings of fact found:

"b) The environment of the Ovens home is conducive to a wholesome life for the minor children; they are helped with their school work, taken to church each Sunday and reside in the home and neighborhood in which they were originally reared and in wholesome surroundings.

\*    \*    \*    \*    \*    \*

"e) The present home life of said minors, above named, is not conducive to a well-balanced life in that excessive drinking is indulged in in said home; the children are not taken to church on Sunday; obscene language is used in their presence, and there is a definite lack of proper parental guidance.

\*    \*    \*    \*    \*    \*

"h) That Plaintiff-Respondent has failed and refused to comply with the order of

this Court, dated June 11, 1959, which required Plaintiff to maintain the minor children in parochial elementary and secondary schools.

"i) The Ovens children living with Defendant are adequately clothed and well groomed as contrasted to the Ovens children living with the Allison family, who when visiting in the Ovens home have to be furnished ample and clean clothing so they can attend church and likewise when taking trips with the Ovens children who reside with the Defendant."

■ Plaintiff cites the Arizona Supreme Court case of Smith v. Smith, 90 Ariz. 190, 367 P.2d 230 (1961) to support his contention that "neither religion, the lack of religion, nor a person's creed can be constitutionally taken into consideration in a child custody action." We do not read the Smith case to be this inclusive. In the Smith case, the trial court had stated its opinion that the mother's religious beliefs made her unfit to have the care and custody of the child. Our Supreme Court stated:

"Patently, the determination of fitness was predicated on appellant's religious beliefs, for in the end the court put appellant to the compulsion of foregoing her beliefs or suffering the loss of her child." Smith v. Smith, supra, 90 Ariz. page 193, 367 P.2d page 233.

This does not prevent the court, in a child custody matter, from taking into consideration the church and Sunday school habits of the children and their respective parents, and the opportunity given to the minor children to attend church when they desire. These matters may well indicate the concern which one of the parents may have regarding the moral climate in which the children are being reared. We do not believe that the 1st and 14th Amendments to the United States Constitution and Article 20, Part First of the Arizona Constitution make church attendance a judicial secret in a child custody case.

Even assuming arguendo that the question concerning the parochial school and church attendance of the minor children may not be considered, the examination of the record indicates that at most, this is a peripheral issue.

The evidence before the court showed that a psychiatrist who examined the plaintiff pursuant to Rule 35(a) of the Rules of Civil Procedure, 16 A.R.S., stipulated to by the parties, described Mrs. Allison as an emotionally unstable personality. The Allison home was described as "pretty messy"; the youngest boy, it was noted, at the age of eight had an extensive vocabulary of four-letter words; the present stepfather was seen on two occasions with one of the daughters in questionable situations. There was also evidence adduced from which the court found that "excessive drinking was indulged in in said home", to wit, a next door neighbor testified to seeing Mrs. Allison on the hood of her car in a nightgown screaming "noises", she fell off and was assisted up by her two daughters. A gas station attendant testified that Mrs. Allison had come into the service station where he worked in various states of drunkenness and on one occasion:

"I was coming back around to seal the gas tank off and put the nozzle on, she hollered at me * * * 'Hey, you fat son-of-a-bitch, can't you do a better job than that on the windshield?' "

In addition, there is the trial court's in-chambers conference with the children themselves. Their testimony is not a matter of record, but there is strong indication that the results of this conference bore heavily on the disposition of the matter.

The trial court stated:

"I am aware of this boy Kevin. I talked to him quite at length and my order provides that Kevin is to have a complete psychiatric and psychological evaluation and he was made a ward of this court because I was concerned."

As we have recently stated:

"In chambers conferences between the trial judge and the children of the liti-

gants have been an important part of many domestic relations trials. * * *

"Frequently these conferences are conducted with a promise by the trial judge that the information is confidential, that the child need not repeat what has been said and the judge will not repeat what has been said. It is vital that this confidence be observed.

"In this, one of the most difficult responsibilities of a trial judge, the judge is privileged to consider the information so secured in his final decision. The information given to the trial judge during the in chambers conference may well be the crucial and determining factor in the court's decision. We do not say that if the record is overwhelming in favor of one decision that the in chambers conference alone will be sufficient to sustain a contrary finding for that problem is not before us. In this case, the reported evidence sustains the decision and we must assume that the decision is fortified and strengthened by the in chambers conference." Bailey v. Bailey, 3 Ariz.App. 138, 142, 412 P.2d 480, 484 (1966).

■ The evidence was more than sufficient from which the trial court, disregarding any evidence of religious attitudes on church attendance, could find that the best interests of the children dictated a change in custody.

■ The appellant further contends that the trust established by the parties at the time of the divorce which provides that the children shall attend a Catholic college also violates the 1st and 14th Amendments of the United States Constitution and the Constitution of the State of Arizona.

The trial judge found the defendant failed to provide for support payments for the college-age girls at $100.00 during the summer months, but also found:

"This court further finds that it would not be equitable for defendant Ovens to be required to furnish college support

money twice for the children. That the trust provides for support, maintenance and educational funds for the benefit of the children of the parties as is set forth in paragraph 10 of the original decree entered in this cause December 12, 1958. * * * That the children of the parties, ———— and ————, may choose their own college but in doing so, they or the plaintiff will be required to make the financial arrangements. That this court should not require the defendant to provide funds for any other school not covered under the trust agreement."

Were this matter before the Court in action to set aside the trust agreement, the religious issue might be directly before us. We do not believe that it is before the Court at this time under these facts. In the first place, we are concerned only with the change of custody of the two boys. In the second place, we are not here to determine the obligation of the father to provide a college education for the two girls in question. Any error there may be in that matter is for another determination and we specifically refrain from making any determination concerning the validity of the religious provision contained in such trust.

### ATTORNEY'S FEES

■ ■ The appellant next contends that the trial court abused its discretion in awarding the amount of $250.00 as and for the plaintiff's attorney. The question is not that this Court would, if called upon, award a different amount which on its face would appear to be inadequate to completely cover Mrs. Allison's total fees in the matter. The law does not require that Dr. Ovens pay for all of Mrs. Allison's fees, but a reasonable amount, and while we may not agree as to the amount awarded, we do not find that the amount awarded was unreasonable under the circumstances.

Judgment of the court below is affirmed.

STEVENS, C. J., and DONOFRIO, J., concur.