485 P.2d 1181

**Rosemary J. STAPLEY, now Rosemary J. Hallquist, Appellant,**

**v.**

**Walter Keith STAPLEY II, Appellee.**

**No. 1 CA–CIV 1403.**

Court of Appeals of Arizona, Division 1.

June 16, 1971.

Rehearing Denied Aug. 5, 1971.

Review Denied Oct. 13, 1971.

---

[1]. At the trial appellant did not contend, nor does the evidence show that the admission was not voluntary. Thus, no hearing on voluntariness by the trial judge was necessary. Loftis v. State ex rel. Eyman, 4 Ariz.App. 3, 417 P.2d 374 (1966).

Robert P. Davidson, Scottsdale, for appellant.

Laney, Warner & Angle, by Jerry L. Angle and Charles R. Hallam, Phoenix, for appellee.

KRUCKER, Chief Judge.

■ This appeal questions the sufficiency of the evidence to support an order changing the custody of three minor children from their mother to their father.[1]

The parties were divorced in August, 1967, and custody of their three children, then 5, 3 and 1, respectively, was given to the mother with the father to have certain visitation privileges, including alternate weekends and "on their birthdays, and national holidays if the children, or any of them, chooses to go with their father on said visits." In December, 1968, the father petitioned the court to modify the custody provisions of the decree because "a certain amount of confusion" had developed with respect to his visitation privileges. In February, 1969, an order was entered modifying the divorce decree as to his privileges. It specifically detailed his visitation rights on weekends, holidays, and during the summer months and further ordered that neither party:

" * * * shall remove said minor children, or cause, or permit said minor children to be removed from the State of Arizona without the consent thereto of the other party hereto being first obtained in writing, or an order of this court being first obtained permitting such removal."

The following July the father petitioned for a change of custody on the grounds that the mother had refused to comply with the prior order of the court in that certain visitorial rights had been denied him, that the mother and her new husband had informed him that he would not be allowed with the minor children, and that the mother contemplated removal of the children from Arizona without obtaining court authorization. He further alleged changed circumstances in that the mother had remarried, and she and her husband were continuously engaged in a course of conduct contemplated to alienate the minor children from the father and to prevent him from visiting with his children. The "home atmosphere" created by the mother was jeopardizing "the health, safety, morals and general welfare of the minor children," it was asserted. Another petition was filed two weeks later alleging that the mother and her husband had in fact removed the children from the State of Arizona to California.

The mother's response admitted that the father would have been entitled to visit with the children on the days he claimed he was denied visitation rights and that she had removed the children from the State without obtaining permission from the court or the father. She claimed that she did not wilfully violate the court orders or what she believed to be "the spirit of the orders" and that although she was advised by counsel as to what the court order said, she did not believe "it meant what it literally said."

An extensive hearing was held with respect to the mother's purported contempt and the father's claim of "changed circumstances." The record of this hearing reflects the following. The mother had married one Raymond Hallquist and both were very devout members of the Jehovah's Witness sect. The new husband set the policies for the household and all decisions were made by him. The children were being indoctrinated in the tenets of the Jehovah's Witnesses: that the flag is a pagan symbol and it is evil to salute it or pledge allegiance to it or to participate in any governmental function, including voting and serving in the armed forces; that it is wrong to celebrate Christmas and

---

1. An additional complaint is made with respect to certain "differences" between the minute entry order and the formal written order. However, no objection with respect thereto was presented to the trial court and we therefore deem it to be without merit. Rule 58(d), as amended, Rules of Civil Procedure, 16 A.R.S.

Easter; and that if the laws of the State of Arizona or the United States are in conflict with their interpretation of the Bible, they are at liberty to disregard the law insofar as it does conflict. The children accompanied the mother and her husband when they went out "servicing", i. e., knocking on doors to obtain converts to their religion. The oldest child, then age 7, was required to sell weekly the religious publication "Watchtower" in shopping centers such as Christown.

The mother and her husband both testified that they did not believe in blood transfusions and that if one of the children should be seriously ill or injured and a blood transfusion necessary to save its life, they would not consent to a transfusion. The mother also admitted, in response to questioning by the court, that if a child needed medical treatment and she had the opportunity to contact the father to consult him with regard to such treatment, she would not do so. The parties, however, admitted to the court that their differences as to child custody were derived from the difference in religious beliefs.

On September 18, 1969, a formal order modifying the divorce decree was entered. The father's request for a change of custody was denied, but his visitation privileges were even more specifically delineated so that the mother could not subsequently claim that she did not understand them. It prohibited removal from the State of Arizona, either permanently or temporarily,[2] without first obtaining the written consent of the father or a court order prior to such removal and decreed:

"\* \* \* that when and if any of the minor children of the parties become ill or injured and require medical treatment, the defendant shall forthwith notify the plaintiff of such illness or injury. The plaintiff shall be entitled to participate in the decision of selecting a physician, hospital and course of treatment. In the

event a whole blood transfusion is recommended by a licensed physician as being in the best interest of any of the minor children, the plaintiff shall be entitled to exclusively make the decision to authorize or not, said whole blood transfusion. In the event the defendant attempts or does interfere with such decision by the plaintiff or fails or refuses to permit him to exercise the aforesaid rights, the permanent care, custody and control of each and all of the minor children of the parties shall thereafter vest in the plaintiff."

The order prohibited the mother from taking or allowing the children to be taken to any public place for the purpose of selling, offering for sale or exposing for sale any newspaper, magazines, periodicals or other merchandise as referred to in A.R.S. § 23-235 and stated that a violation of the spirit or intent of this order would be punishable as a contempt of court. The court found that the mother had wilfully violated prior orders of the court by denying the father visitation rights, adjudged her in contempt for such wilful violation, and directed that she might purge herself of said contempt by strict compliance with the divorce decree as modified.

In December, 1969, the father again petitioned for a change of custody, once again alleging the mother's disregard of the court orders, namely with respect to visitation, notification of illness, and allowing the children to be taken to public places for the purpose of selling, offering and exposing for sale magazines and periodicals. In response to the father's petition, the mother denied contumacious violation of any orders of the court since the September 17, 1969 order and alleged that her failure to advise the father of one child's illness on one occasion and her failure to permit visitation "were the result of extenuating circumstances which will be made apparent through [sic] the Court" and that "the said

---

2. The word "temporarily" was apparently added because the mother testified that she interpreted the prior order pro-

hibiting removal as meaning only permanent removal.

'failures' were the result of concern for the welfare of the children, rather than any contempt for the orders of this Court."

A lengthy hearing was conducted, both parties presenting evidence in support of their respective positions. In addition, the court questioned the mother as to her attitude towards blood transfusions. The tenor of the questioning reflects a grave concern on the part of the court as to what would happen in the event a blood transfusion was necessary:

\* \* \* \* \* \*

"THE COURT: Now, you stated a moment ago that you would have a great difficulty in complying with the Court order as it now stands if you were confronted with an emergency where you were advised you have to have a transfusion for one of your children, that you would have great difficulty in complying with that order because of your personal and religious beliefs. Is that correct?

A. That's right.

Q. But you would have the knowledge and incentive by virtue of this Court order to comply with it; is that correct?

A. Yes, I do have that knowledge.

\* \* \* \* \* \*

Q. Getting back to the blood transfusion question I asked you before, you had some difficulty in bringing yourself around to calling Mr. Stapley when you took the boy to a doctor on at least one occasion. You said that you were kind of avoiding the issue.

A. Yes.

Q. So you were several days late in calling him?

A. No, I think it was one day.

Q. One day, and does that relate to the same reluctance and difficulty that you referred to with respect to a blood transfusion? It is an annoying subject matter?

A. I called Keith twice after that. I really, Your Honor, have attempted—I believe that I have gotten better.

Q. How would you react if you really had a bad emergency—

A. I think I would—

Q. —And Mr. Stapley was not available, he was on a vacation or out of town on business and you were in the emergency ward of Good Samaritan Hospital and Dr. John R. Green or some competent neurosurgeon said if the boy doesn't have an immediate whole blood transfusion he will die? What will you do then?

A. I would recommend a plasma expander or a saline solution.

Q. But unless you could make the decision that of Mr. Stapley's by his being available, you would not give the okay yourself for whole blood or a plasma transfusion?

A. No.

Q. He would have to personally do that?

A. That's right.

Q. Would you be willing to call this Court?

A. I would prefer calling this court.

\* \* \* \* \* \*

THE COURT: \* \* \* What if Mrs. Stapley [father's second wife] was also designated as a party authorized to make such a decision? Would you honor that or does that make a difference?

THE WITNESS. Yes.

Q. It does make a difference?

THE WITNESS: Yes.

THE COURT: You would not accept that?

THE WITNESS: No.

THE COURT: Is that a very definite or is that a snap decision that you would like to think about?

THE WITNESS: I don't believe she has the best interest of the children at heart.

THE COURT: Then it is not—it would not be for a religious reason?

THE WITNESS: I don't think that she could authorize my children to have a blood transfusion.

THE COURT: Even if the Court so ordered it?

THE WITNESS: No—yes. I guess I'd reconsider that. It gets pretty far afield, though."

The trial court found that the mother had flagrantly, wilfully and without cause or justification refused to comply with the orders of the court as to the father's visitation rights, notification of the father as to a child's illness requiring medical attention, allowing the children to be taken to public places in violation of A.R.S. § 23–235, and, therefore, by virtue of her flagrant and wilful violation of court orders, was in contempt of court and had failed to purge herself as previously ordered by the court.

The court further found a material change in circumstances in that the father had remarried; that the mother had remarried and her husband exercised a very strong degree of control and authority over both her and the minor children; that he had aided, advised and participated with the mother in violation of the court order; that the mother and her husband had created an environment of tension and turmoil for the children thus jeopardizing their welfare, by refusing exercise of the father's visitation rights, by refusing to allow the children to participate in activities with their father and instilling fear in their minds as to associating with their father and possessing gifts given by him to them; that the mother and her husband had taken and allowed the children to be taken to public places and from door to door in the community in violation of A.R.S. § 23–235 and the express order of the court; and that all of this conduct on the part of the mother and her husband had adversely affected the children and jeopardized their welfare.

The court also found that the mother and her husband had indicated by their conduct that in the event any child had an illness or an accident which required blood transfusions, they would not comply with court orders to notify the father so that he could make a decision as to whether a transfusion should be given and that if the choice was left to them as to such transfusion, they would allow the child to die rather than to permit a transfusion; that the safety and welfare of the children was in jeopardy and would further be jeopardized if they were allowed to remain in their mother's custody; that the mother and her present husband were not fit and proper persons to have the care, custody and control of the children whereas the father and his wife were; and that the best interests and welfare of the children would best be served by awarding custody of them to the father. This appeal followed.[3] The judgment of the court was not superseded and therefore the children have been in their father's custody since early 1970.

A.R.S. § 14–846 is an expression of the legislative policy as to custody of children. Subsection (B) thereof provides:

"As between parents adversely claiming the custody or guardianship, neither parent is entitled to it as of right, but, *other things being equal,* if the child is of tender years, it shall be given to the mother." (Emphasis added)

We have held that this child custody provision is applicable in determining the right to custody in divorce proceedings. Bergman v. Bergman, 1 Ariz.App. 209, 401 P.2d 163 (1965). It is clear from the record that the lower court adhered to this declared policy in awarding custody of these children to the mother. This, however, does not im-

3. The notice of appeal, in addition to designating this order as the subject of this appeal, has designated the two prior 1969 orders which modify the divorce decree. Those orders, however, are now res judicata since the time for appeal therefrom has expired. Casa Grande Trust Co. v. Superior Court, 8 Ariz.App. 163, 444 P.2d 521 (1968).

pugn the father's fitness—the only presumption that arises from the decree is that "other things" were equal. Ward v. Ward, 88 Ariz. 130, 353 P.2d 895 (1960), modified in another respect, 88 Ariz. 285, 356 P.2d 30 (1960).

■ It is axiomatic that the children's welfare is the primary concern and that appellate courts will defer to the trial court's determination unless the record discloses an abuse of judicial discretion. Dunbar v. Dunbar, 102 Ariz. 352, 429 P.2d 949 (1967); Borg v. Borg, 3 Ariz.App. 274, 413 P.2d 784 (1966). A.R.S. § 25–321 confers continuing jurisdiction on the superior court to alter custodial provisions of a divorce decree. However, before the custody of a minor may be changed, there must be shown a change in the conditions or circumstances of the children affecting their general welfare and that a custodial change would be in their best interests. In re Guardianship of Rodgers, 100 Ariz. 269, 413 P.2d 744 (1966).

Here, the father, who was seeking the change, had the burden of showing changed circumstances affecting the welfare of the children. Hoffman v. Hoffman, 4 Ariz. App. 83, 417 P.2d 717 (1966). The appellate role is a limited one—we do not sit as a super trial court but confine ourselves to one question: Is there evidentiary support for the trial court's determination?

■ We agree with the proposition that the mother's religious views, albeit at variance with those of the majority, is not, standing alone, a ground for a change of custody. Smith v. Smith, 90 Ariz. 190, 367 P.2d 230 (1961); Annot., 66 A.L.R.2d 1410 (1959). Where, however, there is a serious danger to the life or health of a child as a result of the religious views of a parent, courts in other jurisdictions have recognized that this may bar custody by the parent holding such views, or may call for protection against such views by an appropriate order. See, Levitsky v. Levitsky, 231 Md. 388, 190 A.2d 621 (1963); Battaglia v. Battaglia, 9 Misc.2d 1067, 172 N.Y.S.2d 361 (1958); Commonwealth ex

rel. Derr v. Derr, 148 Pa.Super. 411, 25 A.2d 769 (1942). As stated in *Battaglia,* supra:

"Petitioner, of course, enjoys her constitutional right to freedom of religion and may practice the religious faith of her choice without interference. She has not, however, the right to impose upon an innocent child the hazards to it flowing from her own religious convictions. The welfare of the child is paramount.

\* \* \* \* \* \*

The child has a right to survival and a chance to live and the court has a duty to extend its protecting arm to the child. It is of no concern to the court what religious preference the parents may elect. The best interests of the child are the primary concern in all custody conflicts and not the desires of either the mother or father." 9 Misc.2d at 1068, 172 N.Y.S.2d at 362.

*See also,* Prince v. Commonwealth of Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944).

As noted above, in July, 1969, the court declined to change custody merely because the mother's religious beliefs posed a potential threat to the children. Instead, the court entered what it deemed an appropriate order for the protection of the children's welfare. The propriety of such order was never challenged by appeal or otherwise. However, within a very brief period the parties were back in court, once again for the same reason—the mother had ignored the orders of the court.

■ The trial court's position was not an enviable one. It had overlooked the mother's prior conduct in ignoring its orders, or as she puts it, it gave her "a second chance." This action was in keeping with the principle that punishment of a parent for contempt is not to be visited on the children and custody is not to be used as a reward or punishment of parental conduct. Galbraith v. Galbraith, 88 Ariz. 358, 356 P.2d 1023 (1960); Shaffer v. Shaffer, 61 Wash.2d 699, 379 P.2d 995 (1963). Although courts should not change custody

as punishment for contempt, we believe it is not inappropriate to consider such conduct both as a change of condition and as a factor in determining the child's welfare. Young v. Young, 383 P.2d 211 (Okla.1963); Sweeny v. Sweeny, 43 Wash.2d 542, 262 P.2d 207 (1953); Wilson v. Wilson, 260 S.W.2d 770 (Mo.App.1953).

■ The fact that in July, 1969, the trial court refused to change custody on the basis of the facts then presented did not preclude the later modification if the facts warranted it. McClendon v. McClendon, 35 Wash.2d 702, 214 P.2d 708 (1950). Furthermore, it was not inappropriate to consider the mother's conduct which occurred between the time she was awarded custody and the denial of the husband's July, 1969 request for modification in order to show changed conditions. Bachtel v. Bachtel, 97 Ohio App. 521, 127 N.E.2d 761 (1954).

■ The welfare of children requires that they be happy and content, as well as that they be treated with kindness and be well fed, educated and disciplined. The record here reflects that several conditions had occurred since the original decree which materially affected the children's welfare. Although the mother's remarriage in and of itself would not constitute a sufficient reason for changing custody, it was a factor to consider in combination with other circumstances. Oberosler v. Oberosler, 128 Mont. 140, 272 P.2d 1005 (1954); H_____ v. D_____, 373 S.W.2d 646 (Mo. App.1963); 24 Am.Jur.2d Divorce & Separation § 821; Annot., 43 A.L.R.2d 363 § 1 (1955). Another circumstance was her attitude indicating animosity towards the father, as evidenced by her repeated thwarting of his attempts to exercise his rights of visitation. Thurman v. Thurman, 73 Idaho 122, 245 P.2d 810 (1952); 24 Am.Jur.2d Divorce & Separation § 822; Ward v. Ward, supra. Finally, and by no means a factor to be minimized, was the mother's disregard of court orders which adversely reflected on her suitability. Hol-

land v. Holland, 150 Colo. 442, 373 P.2d 523 (1962); S_____ v. G_____, 298 S.W.2d 67 (Mo.App.1957). All the more so when the court orders specifically pertained and were designed to protect the children. As stated in Sweeny v. Sweeny, supra:

"In assuming responsibility for the custody and care of children of divorced parents, the courts are entitled to expect a custodial parent to assume some responsibility and to act in a reliable manner in performing any responsibility imposed by the court as to the care of a child. In the instant case, Mrs. Sweeny's conduct was not solely a matter of violating a court order or of disrespect for the court. That alone is a serious matter and might very well bear upon the determination of a parent's fitness to discipline, instruct, and care for a child. Certainly, a lack of respect for the courts, for law and order, may quite conceivably set an example not conducive to good citizenship or to a well-adjusted character or personality on the part of a child." 43 Wash.2d at 552, 262 P.2d at 213.

The trial court apparently concluded, and the record supports such conclusion, that the Stapley children would continue to be exposed to emotional turmoil and their physical well-being jeopardized if custody in the mother continued. Under the facts and circumstances here involved, coupled with the trial court's advantage in having the opportunity to observe the witnesses personally and to gauge firsthand their candor and truthfulness, we cannot say that there was a manifest abuse of discretion in refusing to give the mother a third chance.

Order affirmed.

HOWARD, J., concurs.

Note: This cause was decided by the Judges of Division Two as authorized by A.R.S. § 12–120(E).

HATHAWAY, Judge (dissenting).

The entire difficulty between the parties seems to stem from their religious differences, as was brought out at the end of

the first hearing by the following colloquy between the court and appellee:

"THE COURT: If you wife was a good Baptist or a good Methodist or a good Presbyterian, or Episcopalian, perhaps I think you are probably generally familiar with the tenets of those religions. They may not be just like your own, but they are not too far removed. Do you think you would be in court here today?

MR. STAPLEY: No, I would not be.

THE COURT: Would you have any great objection to her going to Los Angeles to spend a week or two on the beach even if they attended a Presbyterian conference of some kind for a couple days?

MR. STAPLEY: No, I would not.

THE COURT: It is generally probably a truism as far as you are concerned, the root of all of this problem is the teachings of the religion and what you allege to be the consequences of that as it reflects on the children?

MR. STAPLEY: Directly against normal society, yes."

The mother, as custodian of the children under the decree, was charged with the responsibility of making decisions concerning the children's care, control, education, health and religion. 24 Am.Jur.2d 903, Divorce and Separation § 796; Lerner v. Superior Court for San Mateo County, 38 Cal.2d 676, 242 P.2d 321 (1952); Donahue v. Donahue, 142 N.J.Eq. 701, 61 A.2d 243 (1948); Annot., 66 A.L.R.2d 1410, 1428 (1959). American courts are constitutionally forbidden to interfere with religious practices so long as they do not involve illegal activities. Annot., 66 A.L.R.2d 1410, 1412 (1959). The mother, as custodian of the children, directed them in religious activities and friction and turmoil resulted when, during visitation, the father exposed them to his religious beliefs. The evidence does not appear to implicate appellant any more than it does appellee as the source of contention. Our Supreme Court in Smith v. Smith, 90 Ariz. 190, 193, 367 P.2d 230, 233 (1961) has held:

"A parent who teaches a child doctrines at variance with majority views does not give rise to grounds sufficient to support a change of custody."

The trial court found the mother in contempt for refusing to comply with orders of the court allowing the father to exercise certain visitation rights; she failed to notify the father of illness; and she allowed the children to distribute religious literature to the public. The facts relating to the question of the failure of the mother to grant the father's visitation rights are in dispute. The periods of visitation which the father contends were wrongfully precluded by appellant were: Christmas, 1968; weekend of March 21, 1969; July 3rd and 4th, 1969; July 6th and 7th, 1969 (Walter's birthday); weekend of July 11, 1969. In the court's order of September 18, 1969, the appellant was found in contempt of court as the result of her denial of visitation on the above occasions. In that order the court modified the divorce decree giving the father temporary custody for certain specified periods, but denied the request for change of custody. In connection with the denial of visitation on the weekend of July 11th and 13th, 1969, appellee points out that appellant took the children out of Arizona, in violation of court order, to a Jehovah's Witness rally in Los Angeles, California. But, change of custody was denied. The court should not have reconsidered matters ruled upon and remedied. In re Guardianship of Rodgers, 100 Ariz. 269, 413 P.2d 744 (1966).

Appellee points out that he was forced to get a court order to obtain his visitation rights during Christmas of 1970 and that this was further grounds for custody change. The appellee did obtain his visitation rights albeit through the court. Such contempt is no basis for a custody change, the remedy being punishment by the court of the spouse who is in contempt. As stated in 24 Am. Jur.2d 921, Divorce and Separation § 810:

"The failure of a mother to permit visitation by the father will not in itself warrant a change in custody; nothing short of a showing of unfitness will warrant a

change of custody, and a denial of visitation rights does not conclusively establish unfitness for custody."

Except for Christmas, 1970, the other visitation defalcations complained of had been previously presented to the court and dealt with in the prior orders. The parties' remarriage was also considered at the prior hearing. Appellee complains of appellant's violation of the September 18, 1969 decree by her failure on occasion to inform him of illness or injury to the children and not allowing him to participate in selecting a physician for treatment. The medical problems were minor and appellee was advised shortly after the treatment. A breach of the September 18, 1969 order was insignificant.

Appellee's fear that if the children should need a "whole" blood transfusion, appellant would not allow it, was dealt with in the September 18th decree giving appellee full control over such a decision, which appellant agreed to follow. This provision has not been violated and speculation that it will be does not suffice to change custody. Appellant did violate the September 18th order by allowing the children to distribute material door-to-door, but that is best handled through contempt proceedings, if such conduct is contemptuous. The welfare of children is generally promoted by stability in their custodial circumstances, and the custody should therefore not be changed except for the most cogent reasons, Galbraith v. Galbraith, 88 Ariz. 358, 362, 356 P.2d 1023, 1026 (1960); Gotthelf v. Gotthelf, 38 Ariz. 369, 300 P. 186 (1931); Davis v. Davis, 78 Ariz. 174, 277 P.2d 261 (1954); and then, only if the welfare of the children will be advanced thereby, Ward v. Ward, 88 Ariz. 130, 353 P.2d 895 (1960). Preference should be given to the mother where the custody of children of tender years, particularly requiring their mother's care, are involved, provided all other things are equal. Johnson v. Johnson, 64 Ariz. 368, 172 P.2d 848 (1946); Patterson v. Patterson, 63 Ariz. 499, 163 P.2d 850 (1945). This policy is aptly stated in Annot., 23 A.L.R.3d 6, 17 (1969):

"One facet of the relative fitness criterion which has been elevated by the courts into something approaching an independent principle is the rule, repeated in nearly all the cases, that ordinarily the custody of an infant of tender years should be given to the mother on the ground that the mother is the natural guardian and custodian of her child and that there is no substitute for a mother's love."

Courts are loath to deprive a mother of custody of young children unless she has been shown unfit to provide them a suitable home. 27B C.J.S. 457-458, Divorce § 309(4). Custody change certainly is not an appropriate sanction for contempt. I do not believe the record reveals cogent reasons showing the change is advantageous to the children's welfare.