508 P.2d 366

**STATE of Arizona, Appellee,**

**v.**

**John CHRISTENSEN, Appellant.**

**No. I CA–CR 457.**

Court of Appeals of Arizona,
Division 1,

Department B.

April 5, 1973.

Rehearing Denied May 14, 1973.

Review Denied July 3, 1973.

Moise Berger, Maricopa County Atty. by James S. Tegart, Deputy County Atty., Phoenix, for appellee.

Alan S. Max, Phoenix, for appellant.

EUBANK, Presiding Judge.

This is an appeal by the defendant from a judgment finding him the father of a child born out of wedlock and from the order denying him a new trial. The action was initiated in justice court on the complaint of the mother, pursuant to A.R.S. § 12–841 et seq., alleging that defendant was the natural father of the child born to her out of wedlock on June 11, 1967. Defendant maintained at trial, and raises as his first question on appeal:

". . . [Is] This action, which was brought more than two years after it accrued, which is civil and purely statutory in nature, barred by the one year statute of limitations provided in section 12–541, Arizona Revised Statutes?"

A.R.S. § 12–541 provides that:

"There shall be commenced and prosecuted within one year after the cause of action accrues, and not afterward, the following actions:

\*   \*   \*   \*   \*   \*

"3. Upon a liability created by statute. . . ."

Defendant contends that the mother's action accrued with the birth of the child and any action brought by her to determine paternity could not be prosecuted more than one year after that date.

The statutory scheme developed by the Arizona Legislature to provide for the support of children born out of wedlock is somewhat complex. Initially there is the legislative determination, embodied in A.R.S. § 14–206 that "every child is the legitimate child of its natural parents and is entitled to support and education as if born in lawful wedlock. . . ." Then there

is A.R.S. § 12–631 which provides that an action may be initiated by the mother of a child born out of lawful wedlock against the alleged natural father to establish paternity. Action under this statute must be brought within one year after the birth of the child, and no maintenance for either the child or the mother is provided. Hazelett v. State, 55 Ariz. 141, 99 P.2d 101 (1940). By its own terms this action is expressly declared cumulative to the remedies provided by the following statutes: A.R.S. § 12–841 et seq.—the statutes applicable herein, where an action may be brought on the complaint of the mother, prosecuted in the name of the State and in the event the defendant is found "guilty", he is adjudged the father of the child and charged with its maintenance until it attains majority; and A.R.S. § 12–850, where the State may initiate such an action on its own complaint if the child is or is likely to become a public charge.[1]

Prosecution under these statutes faced a challenge similar to that raised by this defendant in the case of State v. Nerini, 61 Ariz. 503, 151 P.2d 983 (1944) wherein the Arizona Supreme Court determined that the one year statute of limitation of A.R.S. § 12–631, then Sec. 27–402, A.C.A.1939, did not apply to an action under A.R.S. § 12–841, then § 27–405, A.C.A.1939, since the remedies under the two statutes were, by their own terms, cumulative in nature. In Nerini the Supreme Court enunciated the policy which must govern our determination of the matter before us. The Court stated:

". . . [I]t will be observed the above sections [Sec. 27–405 et seq.] . . . do not limit the time in which proceedings of that character may be instituted. The statute is entirely free from any bar of this kind, and indeed there should not be, for the obligation of a father to support his child, whether le-

---

1. This statutory scheme was revised by Session Laws, 1971, Ch. 163, §§ 1–3, effective August 13, 1971, to place exclusive original jurisdiction of the proceed-

ings in the superior court and to consolidate the three forms of action within one statute. This revision does not affect the case at bar.

gitimate or illegitimate, is a continuing duty against which limitation will not run during the time the child needs such care and support. We cannot conceive that the legislature ever intended to limit the time in which such proceedings could be instituted and prosecuted." (61 Ariz. at 507, 151 P.2d at 984–985).

■ Defendant maintains, however, that although the duty of the father to support his natural child, whether legitimate or illegitimate, continues throughout the child's minority, the cause of action to *determine paternity* accrues no later than the birth of the child and continues for one year only.

The Minnesota Supreme Court, in analyzing a statutory scheme virtually identical to our own[2] under circumstances similar to the case at bar determined, in the case of State v. Johnson, 216 Minn. 427, 13 N.W.2d 26, 155 A.L.R. 23 (1944), that the Minnesota six year limitation on actions created by statute would not bar action against the father of an illegitimate child to determine paternity and assess support. The court held:

"Where, as here, a statute imposes upon the father of an illegitimate child an obligation to provide for its care, support, or education during a given period, such as during its minority, the obligation is continuing in nature. Breach or violation of that duty by the father of an illegitimate child likewise is continuing in nature, . . . [citations omitted] the same as in the case of the father of a legitimate child. The statute of limitations does not run against the prosecution of an illegitimacy proceeding during the time the father is liable for the child's support. . . ." (13 N.W.2d at 28).

The court reasoned that:

". . . The rule that the statute of limitations does not run until the liability has ceased to continue rests upon the principle that where the obligation is continuing in nature the breach or violation of duty continues so long as the obligation continues, and that the cause of action or penalty, as the case may be, must be deemed to be continually accruing during the entire time the obligation and the breach thereof continue." (13 N.W.2d at 27–28).

We agree with the Minnesota Supreme Court's reasoning in Johnson, supra. Clearly the issues of paternity and support and maintenance are inextricably bound together in a proceeding under A.R.S. § 12–841, and our Supreme Court was explicit in stating that the Arizona Legislature never "intended to limit the time in which such proceedings could be *instituted* and prosecuted". State v. Nerini, supra, 61 Ariz. at 507, 151 P.2d at 985. (Emphasis added). To hold that the determination of liability is extinguished by a limitations statute while the duty to support continues would emasculate the express holding of our Supreme Court that the remedies under A.R.S. § 12–631 and A.R.S. § 12–841 are distinct and cumulative. *See* State v. Nerini, supra; Hazelett v. State, supra. We hold that the one year statute of limitations A.R.S. § 12–541 does not apply to a paternity action brought under A.R.S. § 12–841 et seq.

Defendant raises as his second issue on appeal the question:

"Does the conduct of the State's only two witnesses, who solicit information about which they will testify after having been placed under the exclusionary rule, so taint the proceedings as to require reversal?"

The record shows that at the outset of the trial the "rule" as to exclusion of witnesses from the trial was invoked. The judge specifically instructed the witnesses that they were to remain outside the courtroom until called to testify, and that they were not to discuss any aspect of their testimony with anyone other than the attorneys. Prior to giving testimony, the moth-

---

2. The Minnesota statute construed in Johnson, supra, and the Arizona statute at issue *sub judice*, were both derived from Minn. Rev.Laws 1905, c. 17.

er's corroborating witness, her sister, made a telephone call, at the mother's request, in an attempt to clarify the date of her uncle's wedding. After completing the call she was called to testify regarding the issue raised by that date, and the fact that the "rule" had been violated became known. Timely objection was made, and the trial judge stated:

"Well, the record may reflect that the objection was indeed timely made.

"Further it is certainly the Court's view that the conduct of the witness in question was indeed contrary to the instructions of the Court and inappropriate.

"The objection, however, is nonetheless overruled. The testimony as given may stand, this being the Court's ruling on the matter considering all of the circumstances surrounding the testimony."

■ The exclusionary "rule" followed by Arizona trial courts is of common law origin and its administration lies within the sound discretion of the trial judge. State v. Sowards, 99 Ariz. 22, 406 P.2d 202 (1965). This principle applies in both criminal and civil proceedings. Allison v. Ovens, 4 Ariz.App. 496, 421 P.2d 929 (1967), vacated in part on other grounds, 102 Ariz. 520, 433 P.2d 968 (1967). In State v. Sowards, supra, where a rebuttal witness under the "rule" was permitted to testify although he had overheard an interview between the county attorney and a defense witness conducted during the course of the trial, our Supreme Court stated that a violation of the exclusionary order does not in and of itself render the witness incompetent to testify. The Court held that the ruling of the trial judge admitting the testimony would not be disturbed on appeal absent a showing of abuse of discretion and prejudice resulting therefrom. *See also* State v. Romero, 85 Ariz. 263, 336 P.2d 366 (1959); Annot. Effect of Witness' Violation of Order of Exclusion, 14 A.L.R.3d 16 (1967); M. Udall, Arizona Law of Evidence, § 84, p. 123 (1960). Consequently, the basic question before us is whether or not the trial judge abused his discretion in refusing to exclude the sister's testimony.

The record shows that prior to the telephone call having been placed by the witness, the mother testified regarding the time she became pregnant by defendant as follows:

"Q [By defense counsel] And it was the act of intercourse in September that you claim made you pregnant, is that right?

"A Yes.

"Q Where did that take place?

"A My uncle was away. He had just gotten married. My sister and I had gone back to the house for the weekend and it was at his house.

"Q Now you indicated in response to Mr. Tegart's [County Attorney] question that the last period that you had was in September of 1966, is that right?

"A Right.

"Q Do you recall the date in September?

"A It would be about in the second week of September but as to the exact dates—

"Q You have previously stated that it was September the 11th, isn't that correct?

"A Yes.

*   *   *   *   *   *

"Q Do you recall how long it was after your uncle had gotten married that this act of intercourse had taken place?

"A They were on their honeymoon. They had gone down to Mexico.

"Q Do you recall how long they were gone?

"A They were gone approximately a week but it was the middle of September, I don't know the exact date, but it was on a weekend.

"Q And they had just gotten married, it was the same weekend they had gotten married that you had intercourse with Mr. Christensen, is that right?

"A  Yes.

"Q  Are you absolutely certain of that?

"A  Yes.

"Q  Now as a matter of fact, [name omitted] it is correct, is it not that the day that your uncle got married was on the 3rd day of September of 1966?

"A  They were going to get married on September 17th.  I believe that is the date they got married.

"Q.  And if the date that they got married is September the 3rd of 1966, you had a menstrual period between the time you had last had intercourse with Mr. Christensen and the time that you got pregnant, isn't that right?

"A  No.

"Q  Were you having a menstrual period when you had intercourse with Mr. Christensen?

"A  No, I was not.

"Q  So that if your period started or you were having a period on September the 11th of 1966 and your uncle was married on September the 3rd of 1966, then you had relations with Mr. Christensen before your last period, isn't that correct?

"A  To my knowledge—no."

In response to a question by the county attorney on redirect the complaining witness testified:

"Q  What was the reason for your going over there?

"A  My sister wasn't feeling good, the air conditioner—refrigeration unit had gone off at the apartment and my uncle's home was refrigerated.  We went over there."

When the sister took the stand, after making the telephone call, she testified to essentially the same circumstances: that both women had gone to the uncle's house in the middle of September, 1966, because the air conditioner in their apartment wasn't functioning; that the uncle was on his honeymoon at that time, and that an act of intercourse took place between complainant

and defendant during that visit.  The witness placed the date at the 17th or 18th of September.  She then stated:

"Q  [By defense counsel] Fine.  And it was on the same weekend in fact that he [uncle] got married that this incident took place at his apartment, isn't that right?

"A  No, sir.  He got married the first part of September.

"Q  Yes.  And this took place four or five days later, is that right?

"A  No, he got married September 2nd or 3rd.  They went on their honeymoon the weekend of the 17th or 18th.

"Q  And if your sister says in her testimony that this took place the same weekend that they got married, she would be in error, is that right?

"A  Yes."

The witness then indicated, as though of her own knowledge, that the wedding had originally been scheduled for the 17th, but had been moved ahead, and that the honeymoon was delayed because the reservations for the trip had been previously made for that later time.

On cross-examination the circumstances of the phone call were thoroughly brought out before the jury.  The mother testified that when a marriage certificate had been shown her by defense counsel indicating a September 3 wedding date she attempted to verify the information with her uncle by telephone.  Unable to do so, she had asked her sister to continue the attempt.  The sister succeeded in contacting him but testified that the only aspect of the case which she discussed with her uncle was the date of his wedding.

■  We agree with appellant that the witnesses' testimony regarding the reasons for changing the wedding date and the previous trip reservations were hearsay and could have been properly excluded.  We do not agree, however, that refusal to exclude the sister's entire testimony was reversible error.  The record shows that the mother's testimony was substantially

**484**

identical before and after the telephone call. The only possible taint on the witnesses' testimony related to the date of the uncle's wedding, not to the fact that it actually occurred. The State is required to prove that an act of intercourse occurred when conception was possible, not the particular date on which the complaining witness became pregnant. Hazelett v. State, supra. These matters were proven irrespective of the date of the wedding. In addition, the jury was fully aware of the telephone call and was instructed that they could consider the motive, interest, bias or prejudice of the witnesses in determining the weight to be accorded their testimony.

We find that the trial court did not abuse its discretion in refusing to exclude the sister's testimony for violating the "rule".

Judgment affirmed.

JACOBSON, C. J., Division 1, and HAIRE, J., concur.