Lindsey J. BONJOUR, Appellant,

v.

Randall Glenn BONJOUR, Appellee.

No. 3965.

Supreme Court of Alaska.

March 30, 1979.

William B. Schendel, Fairbanks, for appellant.

Clem H. Stephenson and Irwin Ravin, Fairbanks, for appellee.

Before BOOCHEVER, C. J., CONNOR and MATTHEWS, JJ., and DIMOND, Senior Justice.

. . .

## OPINION

BOOCHEVER, Chief Justice.

This child custody case is before us for the second time. In this appeal, Lindsey Bonjour Coffman contends that the trial court violated the free exercise of religion and establishment of religion clauses of the United States and Alaska Constitutions in awarding child custody to her former husband.

On June 8, 1976, appellant Lindsey J. Bonjour Coffman (hereinafter Lindsey) was granted a divorce from appellee Randall Glenn Bonjour (hereinafter Randall). Custody of their only child, Michael Joseph Bonjour, born November 2, 1972, was

·awarded to Randall. Lindsey appealed the first determination of child custody to this court. In *Bonjour v. Bonjour*, 566 P.2d 667 (Alaska 1977), we remanded the case for a second determination of custody.[1]

Prior to the new hearing on remand, both parties remarried. Lindsey married John Coffman; Randall married Susan Gilbert. Jakie Gilbert, Susan's child by a former marriage, is about one year younger than Joseph Bonjour.

A second child custody hearing was conducted in late 1977. Upon Lindsey's motion, and in accordance with AS 09.65.130 and *Veazey v. Veazey*, 560 P.2d 382 (Alaska 1977), the trial court appointed a guardian ad litem for Joseph Bonjour. At trial, the guardian ad litem testified and recommended that custody of Joseph be awarded to Lindsey, although he stated his belief that the child would be "well-taken care of" by either parent. On February 1, 1978, the superior court entered a memorandum opinion and findings of fact. Finding that Joseph's best interests could be more effectively served by Randall, the court again awarded principal custody of Joseph to Randall, while giving Lindsey reasonable visitation rights.

Lindsey again appealed the trial court's decision to this court. Lindsey attacks the custody award on the grounds that the trial court improperly relied on the religious affiliations of the parties in violation of her rights under the first amendment to the United States Constitution,[2] the similar religion clauses under the Alaska Constitution[3] and her right to privacy under Alaska law.

Our starting point is AS 09.55.205 which prescribes the powers and duties of the trial court in awarding custody of children pursuant to a divorce proceeding. In pertinent part, AS 09.55.205 provides:

> The court shall determine custody in accordance with the best interests of the child. Neither parent is entitled to preference as a matter of right in awarding custody of the child. In determining the best interests of the child the court shall consider all relevant factors including:
>
> (1) the physical, emotional, mental, *religious* and social needs of the child;
>
> (2) the capability and desire of each parent to meet these needs;
>
> (3) the child's preference;
>
> (4) the love and affection existing between the child and each parent;
>
> (5) the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;
>
> (6) the desire and ability of each parent to allow an open and loving frequent relationship between the child and his other parent. [emphasis added]

The lower court's award of custody to Randall was based upon its examination of the factors prescribed in AS 09.55.205, each of which is arguably relevant to the child's best interests.[4] The trial court delin-

---

1. In *Bonjour v. Bonjour*, 566 P.2d 667 (Alaska 1977), we held that it was error for the trial court to deny custody to Lindsey based on a finding that she was carrying on an adulterous relationship prior to the formal divorce without also making findings as to the adverse effects of that relationship on the child. We stated that "the mother's adulterous relationship is of importance in a child custody case *only as it may affect the best interests of the child.*" *Id.* at 669.

2. The first amendment to the United States Constitution provides in part:
 > Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; . . .

3. Article I, section 4 of the Alaska Constitution provides:

 > No law shall be made respecting an establishment of religion, or prohibiting the free exercise thereof.

 Although we have construed certain provisions of the Alaska Constitution to provide greater protection for individual rights than is afforded by the United States Constitution, *see, e. g., Blue v. State*, 558 P.2d 636, 640–43 (Alaska 1977), we need not construe Alaska's religion clauses more broadly than their federal counterparts in this case. Well-established principles of federal constitutional law make it clear that appellant's rights have been violated.

4. It has long been the rule in Alaska that custody determinations should be made in accordance with the welfare and best interests of the child. *See Ransier v. Ransier*, 414 P.2d 956, 957 (Alaska 1966); *Rhodes v. Rhodes*, 370 P.2d 902, 903 (Alaska 1962).

eated sixteen findings of fact in accordance with the statutory framework. Of the sixteen factors considered, the court found with respect to thirteen of them (numbers 1–3 and 6–15), that either party could meet Joseph's needs or desires. With respect to visitation (number 16), the court found that an award to Lindsey would frustrate Randall's visitation rights less than an award to Randall would frustrate Lindsey's visitation rights. Finally, with respect to the two remaining factors (numbers 4 and 5), the trial court found that Randall could best meet Joseph's best interests. The court's findings concerning religion (number 4) and family environment (number 5) are set forth fully because of their importance to this case.

4. The religious needs of Joseph will be best met by Randall. Randall is involved in an organized religious community and has in the past been principally involved in Joseph's religious education. Lindsey has evidenced a passive interest in this area of Joseph's development, but would not frustrate Randall's desires as to Joseph's religious education.[5]

5. In a family sense the social needs of Joseph can best be met at this time by Randall, who is able to provide in his family unit a surrogate mother in Susan who is a full-time homemaker. Within this family unit is Randall, Susan, Jakie and Katie, a daughter born of the marriage of Randall and Susan. In the custody of Lindsey, Joseph is placed in a day care center for a good portion of a day while Lindsey is working. While I give preference to the family unit in child care, I am not implying that child care institutions are unfit places.

Lindsey argues that the lower court's reliance on finding number 4 violates the first amendment to the United States Constitution. In examining and relying on the religious affiliations of Lindsey and Randall, the trial court was, of course, trying to discharge its duties under AS 09.55.205, which specifically authorizes the court to examine the "religious needs" of the minor child. Notwithstanding the statutory framework, we must determine if the higher principles embodied in the constitution have been violated, for it is well-estaolished that a legislative enactment may not authorize infringement of constitutional rights. *See Marbury v. Madison,* 1 Cranch 137, 2 L.Ed. 60 (1803); *State v. Campbell,* 536 P.2d 105 (Alaska 1975). Thus, we turn to an examination of the statute.

■ The first issue before this court is whether the statute, in specifying that the "religious needs" of the child may be considered in awarding custody, is unconstitutional on its face.[6] As we construe the statute, we find no facial invalidity.

■ Statutes validly enacted by the legislature come to this court with a presumption of constitutionality. If constitutional issues are raised, we have a duty to construe the statute, where it is reasonable to do so, to avoid dangers of unconstitutionality. *Larson v. State,* 564 P.2d 365, 372 (Alaska 1977); *Hoffman v. State,* 404 P.2d 644, 646 (Alaska 1965). Where a narrow construction of a statute will avoid constitutional infirmity without doing violence to the manifest legislative intent, we will interpret the statute accordingly. *Gottschalk v. State,* 575 P.2d 289, 296 (Alaska 1978); *State v. Campbell,* 536 P.2d 105, 110–11 (Alaska 1975); *State v. Martin,* 532 P.2d 316, 321 (Alaska 1975).[7] If a statute is

5. Finding number 4 is based on the following discussion contained in the trial court's memorandum opinion and findings of fact:

Lindsey is a non-churchgoing Christian who wants Joseph to grow up to be honest, considerate of others, able to communicate with other people, committed to his principles, and able to show his feelings. John Coffman is a non-Christian who believes in the Golden Rule, and wants Joseph to grow up to be honest, respectful of other people's

property and willing to work for what he wants. John Coffman would not seek to raise Joseph as a non-Christian. Randall and Susan Bonjour are devout Protestants, and desire to raise Joseph in their faith.

6. The issue of facial invalidity was not addressed by the parties in their briefs.

7. In the past, we have been more willing to narrowly construe a statute in order to save it from a first amendment challenge than to save

susceptible of no reasonable construction avoiding constitutional problems, this court is under a duty to nullify the statute or, if possible, the particular provision found offensive to the constitution.[8] *State v. Campbell*, 536 P.2d at 110–11. The separation of powers doctrine prohibits us from enacting legislation or redrafting patently defective statutes. *Id.* at 111; *Gottschalk v. State*, 575 P.2d at 296.

■ AS 09.55.205(1) specifies that the trial court may consider the religious needs of the child in determining the best interests of the child. Our research reveals no other jurisdiction having a statute specifically allowing a court to consider the religious needs of a minor in a child custody proceeding. The majority of statutes from other jurisdictions are framed in more general terms, requiring the court to determine custody in accordance with the best interests or welfare of the child.[9] While these statutes do not list religious factors among those to be considered by the courts, many appellate decisions have considered the propriety of a trial court's investigation of religious factors in child custody proceedings. Our review of these decisions convinces us that, while there is some differ-

ence of opinion, it is proper for a court to consider the religious needs of a child in making a finding as to its best interests. If courts may independently consider this factor, the legislature may, of course, include it in a statute addressed to child custody proceedings.

Although particular cases are sometimes difficult to categorize, it appears that two lines of authority have developed with respect to the consideration of religious factors in child custody suits. *See generally* Note, *Religion—A Factor in Awarding Custody of Infants?*, 31 S.Cal.L.Rev. 313 (1958). One line of cases seems to place religion beyond the scope of a court's inquiry altogether.[10] We find this view to be unduly restrictive. A court's task in a child custody case is to determine which parent will better serve the best interests of the child. Myriad factors may be considered in working toward this goal. To hold that a court may not consider religious factors under any circumstances would blind courts to important elements bearing on the best interests of the child. The constitution is not so inflexible as to foreclose all inquiry into this sensitive area.[11]

it from a challenge based on the due process clause. *See State v. Campbell*, 536 P.2d 105, 110 n. 18 (Alaska 1975).

8. The doctrine of severability is embodied in AS 01.10.030, which specifies:

> *Constitutionality and severability.* Any law heretofore or hereafter enacted by the Alaska legislature which lacks a severability clause shall be construed as though it contained the clause in the following language, "If any provision of this Act, or the application thereof to any person or circumstance is held invalid, the remainder of this Act and the application to other persons or circumstances shall not be effected [sic] thereby."

9. *See, e. g.*, Cal.Civ.Code § 4600 (Deering Supp. 1978); Conn.Gen.Stat. § 46–42 (1977); Haw. Rev.Stat. § 571–46 (1976); N.H.Rev.Stat.Ann. § 458:17 (Supp.1977) (decree of custody "most conducive to [child's] benefit"); N.Y.Dom. Rel.Law § 240 (Supp.1977); N.C.Gen.Stat. § 50–13.2 (1976 & Supp.1977); Okla.Stat.Ann. tit. 30, § 11 (West 1976). In addition, several states have adopted the wording of section 402 of the Uniform Marriage and Divorce Act, which is framed in terms of the child's best interests. *See, e. g.*, Ariz.Rev.Stat.Ann. § 25–

332 (1976); Ill.Ann.Stat. Ch. 40, § 602 (Smith-Hurd Supp.1978); Mont.Rev.Codes Ann. § 48–332 (Supp.1977).

10. *See Cory v. Cory*, 70 Cal.App.2d 563, 161 P.2d 385, 389 (1945); *Jackson v. Jackson*, 181 Kan. 1, 309 P.2d 705, 711–13 (1957); *Waites v. Waites*, 567 S.W.2d 326, 333 (Mo.1978) (en banc). Although these cases foreclose inquiry into religious beliefs as such, they do not prohibit a court's examination of factors affecting a child's temporal, mental and moral welfare. Thus to the extent that religious practices impact on those factors, they are considered. As a result, the distinction between the two lines of authority may be more apparent than real.

11. *Cf. Wilder v. Sugarman*, 385 F.Supp. 1013 (S.D.N.Y.1974) (three-judge court) (upholding New York statutory scheme providing for matching by religion in adoption proceedings and state funding of church-related foster care institutions against facial constitutional attack); *Dickens v. Ernesto*, 30 N.Y.2d 61, 330 N.Y.S.2d 346, 349, 281 N.E.2d 153, 156, *appeal dismissed*, 407 U.S. 917, 92 S.Ct. 2463, 32 L.Ed.2d 803 (1972) (upholding legislation providing for the placement of a child with adop-

The second line of cases rejects the restrictive view and holds that religious factors may be considered, among other relevant factors, in determining which parent will serve the best interests of the child.[12] This doctrine finds most frequent application in cases where particular religious practices or beliefs pose a threat of or result in actual physical or mental injury to the child. *See Clift v. Clift*, 346 So.2d at 435; *Quiner v. Quiner*, 59 Cal.Rptr. 503, 516 (Cal. App.1967); *Battaglia v. Battaglia*, 9 Misc.2d 1067, 172 N.Y.S.2d 361, 362 (1958); *Welker v. Welker*, 24 Wis.2d 570, 129 N.W.2d 134, 138 (1964).[13] Similarly, if certain religious practices violate valid state statutes, a parent might be deprived of custody based upon the harmful effects on the child. *See Waites v. Waites*, 567 S.W.2d at 333. These courts, however, are virtually unanimous in declaring that religious beliefs alone shall not constitute the sole determinant in child custody awards. *Clift v. Clift*, 346 So.2d at 434; *Mollish v. Mollish*, 494 S.W.2d 145, 152 (Tenn.Ct.App.1972). *See* Note, *Religion—A Factor in Awarding Custody of Infants?*, 31 S.Cal.L.Rev. 313, 316, 319 (1958).

 Aside from these rather clear-cut propositions, we think it constitutionally permissible for a court to take account of the actual religious needs of a child in awarding custody to one parent or another. AS 09.55.205, insofar as it permits a court to consider the "religious needs" of a minor as an aspect of the child's "best interests," does not infringe upon constitutionally protected rights. We stress, however, that the court must make a finding that the child has actual, not presumed, religious needs, and that one parent will be more able to satisfy those needs than the other parent.

tive parents of the same religion "so far as consistent with the best interests of the child and where practicable").

**12.** *Clift v. Clift*, 346 So.2d 429, 434–35 (Ala.Civ. App.1977); *Allison v. Owens*, 4 Ariz.App. 496, 421 P.2d 929, 935 (1966), *cert. denied*, 390 U.S. 988, 88 S.Ct. 1184, 19 L.Ed.2d 1292 (1968); *Carey v. Carey*, 211 N.W.2d 342, 345 (Iowa 1973); *Wojnarowicz v. Wojnarowicz*, 48 N.J. Super. 349, 137 A.2d 618, 621 (1958); *Commonwealth ex rel. Bordlemay v. Bordlemay*, 201 Pa.Super. 435, 193 A.2d 845, 848–49 (1963) (per curiam); *Munoz v. Munoz*, 79 Wash.2d 810, 489 P.2d 1133, 1135 (1971) (en banc); *Schreifels v. Schreifels*, 47 Wash.2d 409, 287 P.2d 1001, 1004–05 (1955). While we find these decisions persuasive insofar as they find no per se constitutional violation when courts examine religious factors, we do not necessarily agree with the result reached by the deciding court in particular cases, nor do we approve the occasional broad language contained in some of the opinions. We also note that some of these cases contain inadequate analysis of the important constitutional issues raised by a court's consideration of religious factors in child custody proceedings.

**13.** Examination of those cases holding that religious beliefs and practices are a proper area of inquiry in child custody proceedings reveals some variation in the imminence of harm and type of harm which must be shown before the religious factors may be relied on to award a child to one parent or another. For instance, in *Quiner v. Quiner*, 59 Cal.Rptr. 503 (Cal.App. 1967), the court held that the *projected* effects of religious practices on the physical, mental and emotional well-being of the child were insufficient to warrant a denial of custody to a parent. The court stated: "Evidence must be produced which will sustain a finding that there is *actual* impairment of physical, emotional and mental well-being contrary to the best interests of the child." *Id.* at 516 (emphasis added). Other courts do not require proof that actual harm is being done to the child. In *Welker v. Welker*, 24 Wis.2d 570, 129 N.W.2d 134 (1964), the court stated that a denial of custody would be warranted if "the prospective custodian hold[s] views which *might reasonably be considered* dangerous to the child's health or morals." *Id.* 129 N.W.2d at 138 (emphasis added). This language from *Welker* also demonstrates willingness on the part of some courts to consider the moral welfare of the child. Other courts have excluded moral welfare from the "best interests" equation. *Clift v. Clift*, 346 So.2d 429 (Ala.Civ.App.1977), held that:

[Q]uestions concerning religious convictions, when reasonably related to the determination of whether the prospective custodian's convictions might result in *physical or mental harm* to the child, are proper considerations for the trial court in child custody proceedings.

*Id.* at 435 (emphasis added). Finally, the Washington Supreme Court has held that a court may not disqualify a prospective custodian unless "there is a clear and affirmative showing that the conflicting religious beliefs affect the general welfare of the child." *Munoz v. Munoz*, 79 Wash.2d 810, 489 P.2d 1133, 1135 (1971) (en banc).

**1240**

By actual religious needs, we refer to the expressed preference of a child mature enough to make a choice between a form of religion or the lack of it. A child's religious needs or preferences may enter into the custody equation in a variety of different ways. For instance, if a court determines that a fifteen-year-old child is a devout adherent to a particular religion or is otherwise deeply religious and that one parent will provide the child greater freedom in his or her pursuit of religious enlightenment, then the court may consider this as a factor in awarding custody. In order to avoid running afoul of the establishment clause, however, the statute cannot be limited to consideration of the formal religious needs of the child. A fifteen-year-old child might conceivably have developed a profound aversion to formal religious training of any sort. If a court finds this to be the case, then in awarding custody, the court may take into account the fact that one parent has shown a greater willingness to respect the child's opposition to formal religion. The primary goal of the court in awarding custody is to further the best interests of the child, which includes respecting the beliefs of a mature child, whether they be religious or non-religious.[14] So long as a court makes findings as to a child's actual needs respecting religion, the court may consider such needs, as one factor, in awarding custody. *Wojnarowicz v. Wojnarowicz,* 48 N.J.Super. 349, 137 A.2d 618, 621 (1958). In such consideration, the court, however, may not substitute its own preferences, either for or against a particular type of religious observance, but must retain a strict neutrality.

We construe AS 09.55.205 as being limited to cases where particular religious practices or beliefs pose a substantial threat of or would result in actual physical, emotion or mental injury to the child or will otherwise have a harmful effect on the child in violation of valid state statutes. In addition, the court may consider the actual religious needs of a child in the manner explained above. Having determined that AS 09.55.205 is not facially invalid as we have narrowly construed it, we turn to an examination of the trial court's application of the statute in this case.

Child custody matters are among the most sensitive legal disputes presented to judicial tribunals. Accordingly, the trial court judge, who is in a position to observe the parties and weigh the many factors relevant to the best interests of the child, is vested with broad discretion in determining custody matters. *Carle v. Carle,* 503 P.2d 1050, 1052 (Alaska 1972). That discretion is not unlimited, however. *Johnson v. Johnson,* 564 P.2d 71, 74 (Alaska 1977). The appropriate standard of review to be applied by this court was set forth in *Carle v. Carle,* 503 P.2d at 1052:

> We will disturb the trial court's resolution of custody issues only if convinced that the record shows an abuse of discretion, or if controlling findings of fact are clearly erroneous. . . . [T]he paramount consideration in any custody determination is what appears to be for the best interests of the child. [citations and footnote omitted]

While we find no fault with the factual findings made by the trial court, the issue presented by this appeal requires us to decide if such factual determinations may

---

14. The maturity of a minor will, of course, vary from case to case and will not always correspond to the minor's chronological age. In our discussion, we have spoken of a fifteen-year-old minor. We believe that, under ordinary circumstances, an average fifteen year old will be of sufficient intellectual and emotional development to warrant a court in giving serious consideration to the child's expressed needs with respect to religion, assuming that the child has some actual needs. While we express no opinion as to the minimum age a child must attain before he or she can properly be classified as having religious needs, the child must be of sufficient age to have developed some understanding of religion and its place in his or her life. We note favorably, however, one court's holding that children aged three, five, and seven are not of sufficient maturity to form an intelligent opinion on so complex a subject as religion or their needs with respect to it. *Wojnarowicz v. Wojnarowicz,* 48 N.J.Super. 349, 137 A.2d 618, 621 (1958).

properly be considered in awarding custody of a child. In short, it would be an abuse of discretion for a trial judge to rely on factors violating the constitutional rights of the parties. *Johnson v. Johnson,* 564 P.2d 71 (Alaska 1977), makes clear our duty in cases where the trial court relies on improper criteria:

> [I]f we find that the trial court has used an impermissible criterion in its determination, we will remand the case for a decision in which proper factors are considered.

*Id.* at 74 (citation omitted).

■ Lindsey contends that the trial court violated her rights and her son's rights under the first amendment to the United States Constitution and the correlative guarantees in the Alaska Constitution in awarding custody of Joseph to Randall based, in part, on the religious affiliations of the parties.[15] She argues that the trial court's reliance upon this factor violates both the free exercise and the establishment clause of the first amendment. Because we find that Lindsey's rights under the establishment clause have been violated, we do not reach the free exercise of religion issue.

■ In awarding custody of Joseph to Randall, the trial court relied, in part, on its finding that Randall and Susan Bonjour were "devout Protestants" and members of an "organized religious community." Lindsey's interest in religion was classified as "passive." Reliance on these findings in determining custody is impermissible under the establishment clause of the first amendment.

■ While the meaning of "religion" under the free exercise clause is still in the process of judicial molding,[16] the establishment clause stands independently as a barrier to government action which favors religion over non-religion. The establishment clause protects the right not to believe in any religion. It protects the right not to be punished for not believing, or simply not caring. The United States Supreme Court stated in *Everson v. Board of Education,* 330 U.S. 1, 15–16, 67 S.Ct. 504, 511, 91 L.Ed. 711, 723 (1946):

> The "establishment of religion" clause of the First Amendment means at least this: Neither a state nor the Federal Government . . . can force nor influence a person to go to or to remain away from church against his will or force him to profess a belief or disbelief in any religion. No person can be punished for entertaining or professing religious beliefs or disbeliefs, for church attendance or non-attendance.

The establishment clause focuses judicial attention on both Randall's and Lindsey's beliefs in an effort to determine if the "religious" is somehow being preferred over the non-religious, or anti-religious.

■ Most of the establishment clause cases to reach the Supreme Court have involved state laws authorizing financial benefits to church-related institutions, *see, e. g., Wolman v. Walter,* 433 U.S. 229, 97 S.Ct. 2593, 53 L.Ed.2d 714 (1977); *Meek v. Pittenger,* 421 U.S. 349, 95 S.Ct. 1753, 44 L.Ed.2d 217 (1975); *Walz v. Tax Commission,* 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697

---

**15.** Lindsey's standing to raise establishment clause violations in her individual capacity is well-established. *See Abington School District v. Schempp,* 374 U.S. 203, 224 n. 9, 83 S.Ct. 1560, 1572, n. 9, 10 L.Ed.2d 844, 859 n. 9 (1963); *McGowan v. Maryland,* 366 U.S. 420, 430, 81 S.Ct. 1101, 1107, 6 L.Ed.2d 393, 401–02 (1961). Lindsey's capacity to raise violations of Joseph's rights with respect to the establishment clause is also settled. *See Abington School District v. Schempp,* 374 U.S. at 224 n. 9, 83 S.Ct. at 1572, n. 9, 10 L.Ed.2d at 859 n. 9. Finally, although it is unclear whether Lindsey has standing to raise a violation of Joseph's free exercise rights under federal doctrine, we

have held that parents have standing to challenge on appeal a determination of what is in the best interests of the child. *Carle v. Carle,* 503 P.2d at 1053 n. 5.

**16.** The United States Supreme Court has never enunciated a constitutional definition of "religion" for purposes of the free exercise clause. The Court has addressed the meaning of religion in the context of the Selective Service statute. *See Welsh v. United States,* 398 U.S. 333, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970); *United States v. Seeger,* 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965).

(1970), or state laws authorizing religious activities in public schools, *see, e. g., McCollum v. Board of Education,* 333 U.S. 203, 68 S.Ct. 461, 92 L.Ed. 649 (1948); *Engel v. Vitale,* 370 U.S. 421, 82 S.Ct. 1261, 8 L.Ed.2d 601 (1962); *Abington School District v. Schempp,* 374 U.S. 203, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963).[17] The principles announced in those cases, however, extend to other forms of governmental "support" of religion, and prohibit state and federal action "favoring the tenets or adherents of any religion or of religion over nonreligion." *McDaniel v. Paty,* 435 U.S. 618, 638, 98 S.Ct. 1322, 1335, 55 L.Ed.2d 593, 608 (1978) (Brennan, J., concurring).

The tripartite test for judging governmental action allegedly violating the establishment clause was recently articulated in *Wolman v. Walter,* 433 U.S. 229, 236, 97 S.Ct. 2593, 53 L.Ed.2d 714, 725 (1977):

> In order to pass muster, a statute [1] must have a secular legislative purpose, [2] must have a principal or primary effect that neither advances nor inhibits religion, and [3] must not foster an excessive government entanglement with religion.

*Accord, Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745, 755 (1971). In order to uphold the constitutionality of the consideration of the religious needs provision of AS 09.55.205, we must further examine the statute in accord with those tests.[18]

Consideration of religion in child custody cases, properly limited to an examination of a child's actual religious needs, can further a secular purpose. The legislature's intent in passing AS 09.55.205 was to assure that the award of custody was in furtherance of the best interests of the child, a secular purpose. If the child should have religious needs, the court's consideration of such needs in awarding custody would still serve a secular, as opposed to a religious, purpose. A court certainly may attempt to accommodate a child in exercising its religious beliefs and in fulfilling its actual religious needs. To hold otherwise would be to sanction an unwarranted hostility toward religion and religious beliefs. *See Walz v. Tax Commission,* 397 U.S. 664, 672, 90 S.Ct. 1409, 1413, 25 L.Ed.2d 697, 703 (1970); *Zorach v. Clauson,* 343 U.S. 306, 313–14, 72 S.Ct. 679, 683–684, 96 L.Ed. 954, 962 (1952). Thus, the statute itself does not violate the purpose prong in allowing a court to consider the religious needs of a child.[19]

Here, however, the trial court made no finding that the child, Michael Bonjour, had any religious needs.[20] In the absence of a finding of religious needs in fact, a presumption that a child "needs religion" converts the secular legislative purpose into a judicial preference for religion. According a preference in child custody proceedings to parents who are members of an

---

**17.** The cases concerning establishment of religion and freedom of religion that have reached this court are few in number, and none is dispositive of the issue here presented. *See Johnson v. Johnson,* 564 P.2d 71, 76 (Alaska 1977); *Lien v. City of Ketchikan,* 383 P.2d 721, 724–25 (Alaska 1963). Also of some relevance in this area is *Matthews v. Quinton,* 362 P.2d 932 (Alaska 1961), where we held that a statute authorizing transportation of nonpublic school pupils on public school buses violated article VII, section 1 of the Alaska Constitution, which prohibits expenditure of public funds for the direct benefit of any religious or other private educational institution.

**18.** In contrast to governmental activity found to infringe the free exercise of religion, once governmental action is found to violate any prong of the tripartite establishment test, the government may not justify the action on the ground that it advances some compelling state interest. *Compare Braunfeld v. Brown,* 366 U.S. 599, 81 S.Ct. 1144, 6 L.Ed.2d.563 (1961) (free exercise analysis), *with Lemon v. Kurtzman,* 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745 (1971) (establishment clause analysis). *See generally* L. Tribe, American Constitutional Law 835–80 (1978).

**19.** However, as we have construed the statute, its principal effect neither advances nor inhibits religion as the court must be strictly neutral. It does not foster an extensive government entanglement with religion.

**20.** Indeed, given the age of the child, it seems highly improbable that the court could have found any religious needs on the part of Joseph. *See* note 14 *supra.*

"organized religious community" violates that strict neutrality which the branches of government, including the judiciary, must assume in considering religious factors. Thus, in this case, the court applied AS 09.55.205 in a manner violative of the first amendment's establishment clause, for it exhibits a preference for the religious over the less religious.

Even if a secular purpose could be found in the trial court's action, its reliance upon the religious affiliations of the parties runs afoul of the second requirement, that the government action have a predominantly secular effect.[21] Laws which incidentally coincide with some religious practices do not violate the establishment clause. *McGowan v. Maryland,* 366 U.S. 420, 81 S.Ct. 1101, 6 L.Ed.2d 393 (1961) (state statute providing for Sunday as common day of rest upheld). Similarly, programs which seek to accommodate the free exercise of religious beliefs and practices in general are not forbidden by the establishment clause.[22] *Zorach v. Clauson,* 343 U.S. 306, 72 S.Ct. 679, 96 L.Ed. 954 (1952) (released time program which allowed children to leave public schools at designated times to receive religious instruction elsewhere upheld). The trial court's action in the instant case goes further, however. The principal or primary effect of giving preference to parents who are members of an "organized religious community" in child custody disputes will be to encourage nonreligious, anti-religious, or simply disinterested parents to engage in religious practices, even if their beliefs are not sincere. This goes beyond accommodation and benevolent neutrality towards religion, while not advancing any values protected by the free exercise clause. In short, it puts government on the side of organized religion, a non-secular result that the establishment clause is designed to prevent.

We now examine the third prong of the establishment clause test, that the statute must not foster an excessive government entanglement with religion. By focusing on the mature child's actual religious needs, as opposed to those needs a court may presume to be desirable, the narrow construction which we have placed on the statute avoids excessive entanglement with religion. It is thus a question of furthering the child's actual needs rather than making a decision as to what type of religious beliefs and practices are preferable in the opinion of the court. If, however, the statute is interpreted, as it was by the trial court, so that the judge must decide which of the parents' religious beliefs and practices are generally more favorable to the welfare of the child, our courts would be taken too far down the path of religious philosophy, thereby entangling them in debates particularly inappropriate to the judicial function.[23]

21. A legislative enactment will not be invalidated under the "effect" prong merely because it may incidentally benefit religion or religious institutions. Rather, the constitutional inquiry focuses on whether the law's "principal or primary effect advances religion." *Tilton v. Richardson,* 403 U.S. 672, 679, 91 S.Ct. 2091, 2096, 29 L.Ed.2d 790, 799 (1971).

22. Thus, where a child is found to have actual religious needs which the court seeks to accommodate in making a custody determination, such accommodation maintains the principle of benevolent neutrality embodied in the establishment clause and does not have the principal or primary effect of advancing religion.

23. Supreme Court cases which have invalidated government action for reasons of excessive entanglement have usually involved surveillance of religious institutions by government. *See, e. g., Wolman v. Walter,* 433 U.S. 229, 252–55, 97 S.Ct. 2593, 2608–2609, 53 L.Ed.2d 714, 735–36 (1977); *Meek v. Pittenger,* 421 U.S. 349, 369–72, 95 S.Ct. 1753, 1765–1767, 44 L.Ed.2d 217, 234–36 (1975); *Lemon v. Kurtzman,* 403 U.S. 602, 615–20, 91 S.Ct. 2105, 2112–2115, 29 L.Ed.2d 745, 757–60 (1971). One attribute of surveillance has been particularly fatal to government action challenged as entangling: the potential for political divisiveness. *See, e. g., Lemon v. Kurtzman,* 403 U.S. 602, 622–25, 91 S.Ct. 2105, 2115–2117, 29 L.Ed.2d 745, 761–62 (1971). Neither of these concerns is particularly salient with respect to child custody matters. Few custody cases will turn upon the religious needs of the child. Few of these cases will be brought back before the courts seeking a modification based on religious factors. Finally, the issues in modification cases will be confined to exploration of the actual religious needs of the child and the comparative ability of either parent to meet these needs. We do

The trial court's action in the instant case thus fails to meet all three prongs of the establishment clause test formulated by the Supreme Court and, accordingly, is not in compliance with the requirements of AS 09.55.205, as we have construed it. The trial court's reliance on the religious affiliations of the parties, in the absence of a showing of actual religious needs of the child, constitutes the use of an improper criterion.[24] The case must therefore be remanded for a new determination of the custody issue without regard to the religious affiliations of Lindsey or Randall. If the superior court finds that it is unable to make a current custody determination based on the testimony adduced at the prior hearings, it may reopen the case and hear further evidence.[25]

RABINOWITZ and BURKE, JJ., not participating.

not believe that such limited inquiry amounts to the type of continuing governmental surveillance, or has the potential for political divisiveness, that has been condemned by the Supreme Court in cases discussing excessive entanglement.

24. It is of no avail to argue, as appellee does, that since finding number 5 alone would support the award of custody to Randall, the inclusion of finding number 4 should not compel this court to remand the case. The demand for legal precision is at its greatest when fundamental rights are at stake. The trial court's findings delineate only two grounds supporting an award of custody to Randall. Thus, while

finding number 5, concerning the family environment, is a factor which clearly may be relied on in making a custody determination, we cannot be certain that the trial court's decision would have been the same in the absence of its reliance on the religious affiliations of the parties.

25. A final argument advanced by Lindsey is that the trial court's treatment of the religion issue violated her privacy rights under Alaska law. Because we have found a violation of the establishment clause, we find it unnecessary to discuss the merits of this argument. We also find no reason to remand the case to a different trial judge.