NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite a memorandum decision in a brief or at oral argument should review Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| DERRICK S., | ) | |
| | ) | Supreme Court No. S-14190 |
| Appellant, | ) | |
| | ) | Superior Court No. 1KE-06-00279 CI |
| v. | ) | |
| | ) | MEMORANDUM OPINION |
| DAWN S., | ) | AND JUDGMENT* |
| | ) | |
| Appellee. | ) | No. 1427 – July 25, 2012 |
| | ) | |

Appeal from the Superior Court of the State of Alaska, First Judicial District, Ketchikan, Trevor Stephens, Judge.

Appearances: Lief A. Thompson, Leif Thompson Law Office, Ketchikan, for Appellant. C. Keith Stump, Ketchikan, for Appellee.

Before: Carpeneti, Chief Justice, Fabe, Winfree, and Stowers, Justices. [Christen, Justice, not participating.]

I.    INTRODUCTION

Derrick S. and Dawn S. had joint custody of their daughters, Yvette and Janice,[1] during the first few years after their 2006 divorce. In December 2009 Dawn invited her new boyfriend, Andrew P., to live with her and the children. Derrick had strong and sincere religious and moral objections to Dawn and Andrew's relationship

---

\*    Entered pursuant to Appellate Rule 214.

[1]    We use pseudonyms to protect the family's privacy.

and cohabitation, and voiced them often to the couple and the children. Dawn filed a motion to modify the custody order so that she would have sole legal and physical custody of the children. Superior Court Judge Trevor Stephens conducted an evidentiary hearing to determine the best interests of the children. The superior court found, under AS 25.24.150(c)(2), that Derrick did not have the capacity to meet the physical, emotional, mental, religious, and social needs of his children but that Dawn did. The superior court modified the custody order to give Dawn sole legal and primary physical custody of the children. Derrick appeals. We conclude that the superior court's factual findings were not clearly erroneous and that it did not abuse its discretion when it weighed the evidence in light of statutory best interest factors and modified custody. We also conclude that the court did not err in finding that there was no domestic violence in Dawn's household. We affirm.

## II.    FACTS AND PROCEEDINGS

Derrick S. and Dawn S. were married on July 11, 1998 in Ketchikan. They have two children: Yvette, born in 1999, and Janice, born in 2004. Derrick is a forester, and Dawn was a homemaker during the marriage and later became a substitute teacher at Yvette's and Janice's school.

### A.    Facts

On June 16, 2006, Derrick and Dawn filed a petition for dissolution of marriage when Yvette was seven and Janice was nearly two. At the time Derrick and Dawn agreed to joint legal and shared physical custody of Yvette and Janice. Specifically, they agreed that:

> [Dawn] will have physical custody of [Yvette and Janice] during the majority of the school year during the school week. [Derrick] will have physical custody on weekends

during the school year and an extended period during the winter.

[Dawn] and [Derrick] will have a varied schedule during the summer months as [Derrick]'s seasonal work may not allow a regular schedule[.]

[Dawn] and [Derrick] will try to approach 50% custody for each parent[.]

Each parent will have physical custody for two weeks vacation during the calendar year[.]

The superior court issued a decree of dissolution of marriage on August 22, 2006, finding that "[t]he written agreements between [the] petitioners concerning child custody . . . are in the best interests of the children of the marriage, and, as between the spouses, are just." Derrick and Dawn worked cooperatively together to create an agreeable custody arrangement of Yvette and Janice for three years.

This changed in December 2009 when Dawn invited her new boyfriend, Andrew P., to live with her and the children. Derrick had strong and sincere religious and moral objections to Dawn and Andrew's relationship and cohabitation. Dawn and Andrew began dating before Andrew and his wife separated. Derrick was upset that Yvette and Janice would be exposed to a lifestyle which contravenes tenets of their Judeo-Christian upbringing holding that adultery and pre-marital cohabitation are wrong.

Dawn's mother, Yvette C., shared Derrick's sentiment about Dawn and Andrew's relationship. Yvette C. owned the house Dawn, Yvette, and Janice had been residing in prior to Dawn's relationship with Andrew. Upon learning that Andrew was moving in, Yvette C. requested that he leave because his presence there contravened her religious beliefs. When he refused, she evicted Dawn, Yvette, Janice, and Andrew from her house. While Dawn and her mother used to be close, their relationship basically ended at that point. Since then Yvette C.'s interactions with Yvette and Janice have been

through watching the children when Derrick is unavailable during his custodial time. The poor state of Dawn and Yvette C.'s relationship also severed Dawn's relationship with her extended family in Ketchikan.

On several occasions Derrick confronted Dawn and Andrew about their relationship. In September 2009 Derrick went to Dawn's residence and tapped on her window at 11:00 p.m. requesting to be let in to talk. Dawn was frightened by Derrick's demeanor and refused. In December 2009 Dawn and Andrew returned to Dawn's residence to find Derrick waiting for them in the driveway. When Dawn declined to speak with Derrick alone, Derrick became loud and shouted at them about living in sin. On Friday, January 29, 2010, Derrick went to the children's school to pick up Yvette and Janice even though Dawn was scheduled to have custody of the children that weekend. Derrick and Dawn met with the principal, and Derrick reiterated his belief that Dawn and Andrew were living in a sinful relationship and that Dawn should not be allowed to leave with the children under such circumstances. Upon leaving the school Derrick confronted Andrew, who had been waiting in the car for Dawn, by shouting at the car window; Yvette, Janice, and other school children witnessed this conduct. On February 4, 2010, at Yvette's basketball game, Derrick asked Dawn where the children would be that weekend while Dawn was holding hands with Janice and another child. Derrick became loud and confrontational about Dawn's lifestyle in front of other parents and children, and Janice had to be escorted away from the situation.

Derrick has also expressed his disapproval of Dawn's relationship with Andrew directly to his children. For example, Derrick once made Yvette recite the Ten Commandments before she was allowed to get out of the shower, targeting the commandment prohibiting adultery and emphasizing that adultery was occurring at Dawn's residence.

On April 8, 2010, Derrick filed a motion to enforce the custody agreement. Up until that point Derrick and Dawn had agreed that Dawn would have physical custody of the children for more than 50% of the year due to Derrick's seasonal work. Derrick calculated his custody to be about 43-44% of the year, and he sought to increase his custodial time with the children. Dawn filed a motion to modify the original custody order to have sole legal and physical custody of Yvette and Janice.

## B.    Proceedings

The superior court conducted a four-day evidentiary hearing on the motions. Dawn was represented by counsel and Derrick was pro se. Derrick called eleven witnesses, Dawn called five witnesses, and the court-appointed custody investigator, William Cool, testified as well.

During the hearing much of Derrick's case focused on Andrew's character. Andrew had been arrested four times in relation to drinking and driving, and two Driving Under the Influence (DUI) convictions. After his December 2009 DUI charge, Andrew was required to have a third-party custodian, a responsibility which Dawn agreed to assume. Andrew testified that he had not consumed alcohol since his last DUI but admitted that he had "alcoholic tendencies" and attended counseling. His ex-wife and daughter testified that when his children were still living at home, Andrew would often come home "falling down drunk" and belligerent. Andrew denied any physical, verbal, or emotional abuse toward his own children while they were growing up or as adults, but admitted that there had been confrontations. This contrasted with the testimony of his ex-wife and children that Andrew had physically, verbally, and emotionally abused the children on several occasions. Andrew's daughter testified that in one instance Andrew pushed her into a wall, grabbed her by her throat, and cursed at her. She generally characterized her father as being "awfully manipulative" and having a "terrifying

temper" that can be "scary" to young children who have only been exposed to his kindness. Andrew's son testified that his father had called him several explicit names and had been physically abusive towards him at least twice. He also testified that Andrew e-mailed the custody investigator's confidential report of Yvette and Janice the morning he was to testify, emphasizing certain parts about Derrick's yelling at his daughters. During the hearing Dawn's attorney did not cross-examine Andrew's children.

Much of Dawn's case focused on Derrick's controlling and intimidating nature. Dawn testified that during their marriage Derrick was verbally but not physically abusive towards her. Dawn also described the times Derrick confronted her and Andrew about their relationship. This included an instance in July 2010 after the custody motions had been filed. Derrick went to Dawn's residence to pick up Yvette and Janice, but the family was not at home so Derrick waited. When the family got back, Derrick blocked Dawn's and Andrew's path and yelled at Andrew. This frightened the children because even though they had been taken into the house, they could still hear Derrick. Derrick also confronted Andrew in September 2010 when Yvette and Janice were still in the vehicle.

The custody investigator issued two reports and testified regarding his findings and opinion. For the first report, Cool did not interview the children because Derrick requested him not to involve them in the custody dispute and make them choose sides. The superior court subsequently ordered Cool to interview the children; Cool did so and issued a supplemental report. In the first report he wrote:

> [Derrick S.] displays an inflexible stance in the expectations that he holds for the girls' behaviors and development. In comparison to [Derrick], [Dawn S.] exhibits an overly permissive response to the children's behaviors and

attitudes. . . .  Both parents have developed and maintained significant, affectionate ties with their daughters.

Cool also noted:

> [Derrick's] disapproval for [Dawn's] and [Andrew's] involvement creates a divisive wedge in their abilities to work together in a cooperative manner for their daughters' needs and interests.  [Derrick and Dawn] have experienced significant decline in their communications, mutual respect, willingness to work together and focus upon the children.  [Yvette and Julie] may be lost in the shuffle as [Derrick and Dawn] remain steadfast in their opposing positions during this highly conflictual time.

In his second report, after interviewing Yvette and Janice, Cool outlined their preferences regarding custody:

> 1. [Yvette and Janice] want to stay with the mother during school nights and some weekends throughout the entire year.  They want to attend the mother's church. [Yvette] agrees to attend classes at the father's church.
>
> 2.  They want the freedom and option to call the mother at their request and convenience.
>
> 3.  The . . . children desire the father stop his yelling about other persons or situations that do not pertain to them.
>
> 4. [Yvette] prefers to spend individual time with her mother.  She does not want to be left alone with the father.  She prefers to accompany her sister to the father's home as a means to comfort [Janice].

The custody investigator also noted specific desires Yvette and Janice had when visiting Derrick:

> The children find the father displaying certain behaviors and emotions that upsets them.  They are uncertain how to address their concerns with him about his actions.  They desire to limit their exposure to their father's anger and

demands or restrictions. [Yvette and Janice] regard their mother's care and home as comforting, secure, and responsive to their requests. Until [Derrick] can contain his disruptive actions, the children wish to limit their time in his care to occasional weekend visits.

Cool also discussed Yvette's need for counseling. While staying with Derrick in November 2010, Yvette asked but Derrick refused to allow her to telephone Dawn. Yvette became upset and locked herself in the bathroom where she wrote a note questioning her existence. Cool interviewed Yvette, and she discussed her thoughts of hurting herself. Yvette thereafter entered counseling.

On January 14, 2011, the court issued a 24 page memorandum decision and order. The superior court made comprehensive findings of fact. It found that Derrick frequently expressed his disapproval of Dawn's relationship with Andrew in the presence of, and to, Yvette and Janice. The court noted the time when Derrick made Yvette recite the Ten Commandments before she could get out of the shower, and emphasized that adultery was occurring at Dawn's residence. The court also found that Andrew "had problems at times controlling his anger. He had altercations with his children during which he used abusive language. Some of the altercations were physical. He abused alcohol. He had DUI convictions. He was intoxicated in front of the children a number of times."

With regards to the children, the court found that Yvette "prefers to reside with [Dawn] and visit [Derrick] on occasion. . . . Her preference is genuine and sincere. [Derrick]'s conduct towards and negative comments about [Dawn] have had a substantial negative impact on [Yvette]. . . . She is not comfortable talking with [Derrick] about her cares and concerns. She views [Dawn] as being a more sensitive and comforting parent." As to the children's religious needs, the court found that "[Dawn], [Janice], and [Yvette]

have recently attended the Lutheran Church on a fairly regular basis. They enjoy it there. [Yvette] is willing to continue with her confirmation classes at Holy Name [her father's church]."

The superior court concluded that "[Dawn]'s relationship with [Andrew] has resulted in substantial changes affecting [Janice] and [Yvette]. These changes include: [Derrick]'s reaction to the relationship; and, the rift between [Dawn] and her extended family in Ketchikan. The changes also include the deterioration of the relationship between [Dawn] and [Derrick]."

The superior court then conducted a best interests analysis to determine whether modification of custody would be in the best interests of Yvette and Janice. The superior court analyzed each factor of AS 25.24.150(c)[2] and concluded

---

[2]    Under AS 25.24.150(c), in determining the best interests of the child, the court shall consider:

> (1) the physical, emotional, mental, religious, and social needs of the child;
>
> (2) the capability and desire of each parent to meet these needs;
>
> (3) the child's preference if the child is of sufficient age and capacity to form a preference;
>
> (4) the love and affection existing between the child and each parent;
>
> (5) the length of time the child has lived in a stable, satisfactory environment and the desirability of maintaining continuity;
>
> (6) the willingness and ability of each parent to facilitate and encourage a close and continuing relationship between the other parent and the child, except that the court may not

(continued...)

that it was in the children's best interests to spend most of their time in Dawn's home. The most important factor, the superior court noted, was AS 25.24.150(c)(2). Under AS 25.24.150(c)(2), the court is to consider "the capacity and desire of each parent to meet [the physical, emotional, mental, religious, and social] needs" of the child. The superior court concluded that Dawn was capable of meeting the children's needs but that Derrick was not. The court modified custody to give Dawn sole legal and primary physical custody of the children; the court explained that its legal custody determination was based in part on the fact that Dawn and Derrick are unable to communicate effectively with each other. The court also established Derrick's visitation schedule which included every other weekend, spring breaks, and alternating holidays.

Derrick appeals.

---

[2] (...continued)
consider this willingness and ability if one parent shows that the other parent has sexually assaulted or engaged in domestic violence against the parent or a child, and that a continuing relationship with the other parent will endanger the health or safety of either the parent or the child;

(7) any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents;

(8) evidence that substance abuse by either parent or other members of the household directly affects the emotional or physical well-being of the child;

(9) other factors that the court considers pertinent.

## III.   STANDARD OF REVIEW

"Trial courts have broad discretion in determining child custody."[3] A child custody order may be modified if the court determines that a substantial change in circumstances has occurred and modification is in the best interests of the child.[4] We set aside the superior court's custody determination "only if the court abused its discretion or if its findings of fact are clearly erroneous."[5] An abuse of discretion occurs when the court "considers improper factors in making its custody determination, fails to consider statutorily mandated factors, or assigns disproportionate weight to particular factors while ignoring others."[6] Factual findings are clearly erroneous when, based on the entire record, they leave us "with a definite and firm conviction . . . that a mistake has been made, even though there may be evidence to support the finding."[7] The trial court's factual findings are given particular deference "when they are based primarily on oral testimony, because the trial court, not this court, performs the function of judging the credibility of witnesses and weighing conflicting evidence."[8]

---

[3]   *Ebertz v. Ebertz*, 113 P.3d 643, 646 (Alaska 2005).

[4]   AS 25.20.110(a); *Jenkins v. Handel*, 10 P.3d 586, 589 (Alaska 2000).

[5]   *Ebertz v. Ebertz*, 113 P.3d *at 646.*

[6]   *Id.* (internal quotations omitted).

[7]   *Jenkins*, 10 P.3d at 589.

[8]   *Ebertz*, 113 P.3d at 646.

## IV.    DISCUSSION

### A.    The Superior Court Did Not Err In Concluding That Derrick Did Not Meet His Children's Needs Under AS 25.24.150(c)(2).

Under AS 25.24.150(c)(2), the superior court "shall determine custody in accordance with the best interests of the child. . . .  In determining the best interests of the child the court shall consider . . . the capability and desire of each parent to meet [the physical, emotional, mental, religious, and social] needs [of the child]."

In its memorandum decision and order the superior court stated, "[Derrick] is not capable of meeting all of [Janice's] and, in particular, [Yvette's] emotional, mental, and social needs.  He wants to.  He intends to.  He thinks he is doing the right things.  But he is not."  The court explained that Derrick had become "somewhat obsessed with [Dawn]'s relationship with [Andrew]" and "is apparently oblivious to the negative effect that his related words and conduct have had on the children, [Yvette] in particular."  The court determined that Derrick's "personality and rigid parenting style" result in Yvette "not feel[ing] comfortable in his home."  The court also found that "[h]is home is not a very loving, comforting, or caring environment."  And when addressing the children's social needs, the court found that the testimony of Yvette's former basketball coach was "credible evidence that [the children's] friends are not comfortable visiting them at [Derrick]'s home."

The superior court's finding that Derrick is not capable of meeting all of Janice's and Yvette's emotional, mental, and social needs is well supported in the record and does not leave us "with a definite and firm conviction . . . that a mistake has been made."[9]  The record shows that Derrick clearly cares about his children and their well-being.  But the record also shows that Derrick has consistently confronted Dawn and

---

[9]    *Jenkins,* 10 P.3d at 589 (internal quotation marks omitted).

Andrew about their relationship in front of the children. The superior court acted within its discretion to find the basketball coach's testimony about her children feeling uncomfortable sleeping over at Derrick's home more credible than conflicting evidence Derrick presented.[10] Based on the record, the court's finding that Derrick is not capable of meeting all of Janice's and Yvette's emotional, mental, and social needs is not clearly erroneous.

When addressing the children's religious needs, the superior court correctly analyzed this factor in accordance with our holding in *Bonjour v. Bonjour*.[11] In *Bonjour*, we held that it was "constitutionally permissible for a court to take account of the actual religious needs of a child in awarding custody to one parent or another."[12] "By actual religious needs, we refer to the expressed preference of a child mature enough to make a choice between a form of religion or the lack of it."[13] "According a preference in child custody proceedings to parents who are members of [a certain religion] violates that strict neutrality which the branches of government, including the judiciary, must assume in considering religious factors."[14]

Derrick attempts to distinguish his position from *Bonjour* by framing his objection to Dawn and Andrew's relationship as a moral issue rather than a religious one. However, in this case, this is a distinction without a difference. Before the divorce Derrick and Dawn raised the children in a Judeo-Christian household. Derrick continues

---

[10]     *Ebertz*, 113 P.3d at 646.

[11]     592 P.2d 1233 (Alaska 1979).

[12]     *Id.* at 1239.

[13]     *Id.* at 1240.

[14]     *Id.* at 1242-43

to have strong and sincere religious and moral beliefs, and these beliefs naturally influence the moral framework he applies to the children. Dawn has chosen to take the children to a different church, and apparently has views different than Derrick's concerning how to raise the children. There is nothing wrong with a parent teaching and raising children to understand and follow the parent's religious and moral precepts, but the court cannot take sides and adopt one parent's precepts over the other parent's. Rather, the court must remain neutral when considering the actual religious needs of the children in custody proceedings.[15] The court can consider and take account of a mature child's expressed preferences as they relate to the child's religious needs; the court cannot choose between two parents' competing religious and moral beliefs in deciding which belief system is in the child's best religious and moral interests.[16]

Here, the superior court found that "[i]t has not been shown that [Janice] is of sufficient maturity to make such religious choices" but "[i]f she is of sufficient maturity, the record reflects that she wants to attend the church [Dawn] attends." We see no error in this finding. On the other hand, the court found that Yvette "is of sufficient maturity to make religious choices." The court relied on the custody investigator's finding that Yvette agreed to continue attending religious instruction classes at Derrick's church, but also wanted to attend Dawn's church. The court further found that "[t]he record does not reflect [Yvette] has a personal religious objection to [Dawn]'s relationship with [Andrew]." We see no error in these findings. The superior court was clearly respectful of Derrick's sincerely held religious and moral beliefs, but it also carefully limited its analysis of the children's best interests in accordance with *Bonjour*.

_____

[15]    *Id.*

[16]    *Id.* at 1240.

-14-                                                    *1427*

Considering the record as a whole and the superior court's findings regarding Derrick's tendencies to interject his own feelings and anger towards Dawn and Andrew's relationship in ways that upset, frightened, and harmed his children, the superior court did not err in concluding that Derrick did not meet his children's needs under AS 25.24.150(c)(2).

**B.      The Superior Court Did Not Abuse Its Discretion In Determining That Derrick's Reaction To Dawn's Cohabitation With Andrew Is Harmful To Yvette And Janice.**

The superior court found that "[Derrick]'s conduct towards and negative comments about [Dawn] have had a substantial negative impact on [Yvette]." It found that Derrick "is apparently oblivious to the negative effect that his related words and conduct have had on the children, [Yvette] in particular."

The record amply supports the court's findings — it was not an abuse of discretion for the superior court to determine that Derrick's reactions to Dawn and Andrew's relationship were harmful to the children. Derrick openly acknowledged that he told the children that their mother and Andrew were committing adultery. As previously noted, on one occasion he made Yvette recite the Ten Commandments and stop at the commandment regarding adultery, emphasizing that adultery was occurring in Dawn's residence. The custody investigator testified that "for [Derrick] to continue to repeat [his disapproval of the mother's lifestyle] over and over again for them, the girls have gotten to the point where they feel like he's yelling at them for their mother's decision." Derrick consistently and loudly confronted Dawn and Andrew about their relationship in front of the children. Based on this evidence, the superior court did not

abuse its discretion in finding that Derrick's reactions to Dawn and Andrew's relationship were harmful to the children.[17]

C. **The Superior Court Did Not Clearly Err In Finding That Andrew Is A Positive Influence On Yvette And Janice**.

The superior court found that Janice, and particularly Yvette, "have developed a close, affectionate, and loving relationship with [Andrew]. . . . He engages with the children. He talks with them. He listens to them. He attends their activities." The court further found, "[Andrew] has made positive contributions to [Dawn]'s household."

Derrick argues that the superior court's finding that Andrew was a positive influence on Yvette and Janice does not properly reflect Andrew's prior history with his own family. The court found that "none of [Andrew's] past inappropriate behavior has occurred" while living in Dawn's residence. The court considered that "[i]t is possible that such behavior could occur in the future" but was "confident that [Dawn] would not stand for it and would not allow it to have an [e]ffect on [Janice] and [Yvette]." The

---

[17] Derrick also argues that he has the duty, under Alaska Statute 11.51.100(a)(3), to keep his children away from Andrew. AS 11.51.100(a)(3) states:

> A person commits the crime of endangering the welfare of a child in the first degree if, being a parent . . . the person . . . leaves the child with another person knowing that the person has previously physically mistreated or had sexual contact with any child, and the other person causes physical injury or engages in sexual contact with the child.

But here there is no evidence that Yvette and Janice have been physically or sexually abused while in the company of Andrew. And Derrick's argument is undercut by the trial court's explicit finding that Dawn's children benefit from Andrew's presence in the household.

court found that there was "no evidence that [Andrew] has abused alcohol since December 2009" or "that his alcohol consumption has had any [e]ffect on [Janice's] or [Yvette's] emotional or physical well-being." These findings are supported by the testimony from Andrew and Dawn and are not clearly erroneous.

Derrick also argues that the superior court did not address Andrew's character for dishonesty or his use of manipulation. While it is true that the court did not address these issues, the court noted that it would only consider evidence that "directly affects the well being of the children." While lying to and manipulating his own children in the past may suggest that Andrew could do the same to Yvette and Janice in the future, it was within the discretion of the superior court to judge the credibility of witnesses and weigh conflicting evidence.[18] The superior court was not required to explicitly address these issues in its order.

The court's finding that "[Andrew] has made positive contributions to [Dawn]'s household" is supported in the record. Several witnesses testified as to Andrew's loving relationship with Yvette and Janice. Yvette's former basketball coach testified that she observed Andrew's attentiveness towards both children. Dawn testified that Yvette does not fear Andrew and has an affectionate relationship with him. Andrew also testified that he and Yvette get along well. No contrary testimony on Andrew's positive relationship with Yvette and Janice was presented. We reiterate that the trial court's findings are given deference when they are based on oral testimony because the trial court is in the best position to judge the credibility of witnesses and weigh

---

[18]     *Ebertz v. Ebertz*, 113 P.3d 643, 646 (Alaska 2005).

conflicting evidence.[19] It was not clearly erroneous for the court to find that Andrew was a positive influence on Yvette and Janice.

**D.    The Superior Court Did Not Clearly Err When It Determined That There Was No Evidence Of Domestic Violence In Dawn's Household.**

In its consideration of AS 25.24.150(c)(7), the superior court found "[t]here is no evidence of [domestic violence], child abuse, or child neglect . . . in either [Derrick]'s or [Dawn]'s households."[20] Derrick argues that the court did not properly consider the evidence presented of domestic violence Andrew may have committed against his family in the past. Derrick claims that our holding in *Michele M. v. Richard R.*[21] required the court to consider Andrew's history of abuse prior to his current relationship. However, *Michele M.* is inapplicable because the statute addressed in that case, AS 25.24.150(h), requires an examination of the domestic violence history of the

---

[19]    *Id.*

[20]    Under AS 25.24.150(c)(7), the court is required to consider "any evidence of domestic violence, child abuse, or child neglect in the proposed custodial household or a history of violence between the parents."

[21]    177 P.3d 830, 836-38 (Alaska 2008) (holding that it was plain error for the trial court not to determine whether the father's previous acts of domestic violence constituted a "history of perpetrating domestic violence" under AS 25.24.150(h)).

*parents* when determining custody.[22]  Alaska Statute 25.24.150(h) does not apply to Andrew as he is neither a parent nor someone seeking custody in this proceeding.[23]

The superior court did not clearly err when it found that there was no evidence of domestic violence in Dawn's household.  Derrick points to no evidence to contradict this finding.[24]

## V.    CONCLUSION

We AFFIRM the superior court's decision to modify custody and award Dawn sole legal and primary physical custody.

---

[22]      AS 25.24.150(h) states in part:

> A parent has a history of perpetrating domestic violence . . . if the court finds that, during one incident of domestic violence, the parent caused serious physical injury or the court finds that the parent has engaged in more than one incident of domestic violence.

[23]      Evidence of domestic violence of a new partner living in the household may be relevant under AS 25.24.150(c)(7).  But here the court found that there was no domestic violence in Dawn's home.

[24]      Derrick argues that the superior court clearly erred when it assumed facts that were never in the record.  Derrick argues that the superior court erroneously described the way Andrew's ex-wife discovered Andrew's relationship with Dawn.  The details of Andrew and his ex-wife's relationship are irrelevant to the custody hearing, and the court's error in description, if any, is harmless.

Derrick also points out that the court misstated an event occurring in July 2010 as occurring in December 2009.  This error is harmless.

Derrick also argues that the record does not support the superior court's finding that Derrick has "made disparaging comments about [Dawn] in the children's presence when talking with [Yvette C.]."  If this is error, it is harmless because there were other incidents in evidence where Derrick made disparaging comments about Dawn in the presence of the children.